SERVICE EMPLOYEES INTERNA-
TIONAL UNION, LOCAL 250,
AFL–CIO, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,

E. H. Limited, d/b/a Earringhouse
Imports, Intervenor.

E. H. LIMITED, d/b/a Earringhouse
Imports, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,

Service Employees International Union,
Local 250, AFL–CIO, Intervenor.

Nos. 77–1165, 77–1630.

United States Court of Appeals,
District of Columbia Circuit.

Argued June 8, 1978.

Decided April 25, 1979.

Rehearing Denied May 31, 1979.

David A. Rosenfeld, San Francisco, Cal., for petitioner in No. 77–1165 and intervenor in No. 77–1630.

Robert V. Magor, San Francisco, Cal., for petitioner in No. 77–1630 and intervenor in No. 77–1165.

Allison W. Brown, Jr., Deputy Asst. Gen. Counsel, N. L. R. B., Washington, D. C., with whom John S. Irving, Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, and Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., were on the brief, for respondent.

Claud L. McIver, III, Atlanta, Ga., was on the brief for amicus curiae Florida Mining & Materials Corp., urging that the decision of the N. L. R. B. be overruled.

Before WRIGHT, Chief Judge, MacKINNON, Circuit Judge, and HOFFMAN,* Senior District Judge.

---

* Of the United States District Court for the Eastern District of Virginia, sitting by designation pursuant to 28 U.S.C. § 294(d) (1976).

**WALTER E. HOFFMAN, Senior District Judge:**

Because "working time is for work,"[1] we are here concerned with the issue of an employer discharging thirteen employees (essentially the entire production force) for leaving work during regular work hours, contrary to the express orders of the employer, for the purpose of attending *en masse* a representation hearing scheduled before the National Labor Relations Board (the Board), even though the employer had volunteered to permit one employee to attend the hearing in a representative capacity.

Notwithstanding the findings and conclusions of the administrative law judge (ALJ) that the employer acted lawfully in discharging the thirteen employees for acting contrary to the employer's orders, and with members Penello and Walther dissenting, the three-panel majority consisting of chairperson Murphy and members Fanning and Jenkins effectively reversed the ALJ by holding that the employer violated Section 8(a)(1) and (4) of the National Labor Relations Board Act, 29 U.S.C. § 158(a)(1) and (4),[2] in discharging the employees. The Board also directed the issuance of a bargaining order to the employer for a violation of § 8(a)(5) of the Act "by refusing to recognize and bargain with the Union on or about August 1, 1974 (and thereafter)."[3]

The matter originated in San Francisco, California, where the employer conducts its place of business and the employees presumably reside. Following the filing of the charge against the employer on August 9, 1974, two amendments were permitted and the parties were at issue on January 24, 1975. Hearings before the ALJ were conducted on February 6–7, 1975. On April 3, 1975 the ALJ rendered his decision. The union, the employer and the Board's general counsel each filed exceptions. The Board, holding the case until January 17, 1977, finally issued its order. The union, in No. 77–1165, sought review of a portion of the order in this court under § 10(f) of the Act, 29 U.S.C. § 160(f).[4] In No. 77–1630, the employer filed a petition to review with the United States Court of Appeals for the Ninth Circuit, and the Board filed a cross-application to enforce the Board's order of January 17, 1977. The United States Court of Appeals for the Ninth Circuit transferred the employer's petition to this court pursuant to 28 U.S.C. § 2112(a). By order dated June 27, 1977 in this court the two cases were consolidated for all purposes, with the employer being granted leave to intervene in No. 77–1165, and the union being accorded the same right in No. 77–1630.

There is no material dispute as to the facts although, by reason of the language used in the majority and dissenting opinions, it would appear that there were varying inferences to be drawn from the evidence without specific findings as to credibility, thus making it necessary to elaborate in detail the pertinent evidence.

---

1. See concurring opinion of Mr. Justice Powell in *Beth Israel Hospital v. N.L.R.B.,* 437 U.S. 483, 98 S.Ct. 2463, 57 L.Ed.2d 370 (1978). See also *Stoddard-Quirk Manufacturing Co.,* 138 NLRB 615, 617 (1962); *N.L.R.B. v. Essex Wire Corp.,* 245 F.2d 589, 593 (9th Cir. 1957).

2. As codified in 29 U.S.C. § 158, § 8(a)(1) and (4) of the National Labor Relations Act read:
   (a) It shall be an unfair labor practice for an employer—
   (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
   . . . . .
   (4) to discharge or otherwise discriminate against an employee because he has filed charges or given testimony under this subchapter.

3. Since this finding was principally related to the discharge of the thirteen employees, it will only be touched upon in this opinion by reason of our disposition of the § 8(a)(1) and (4) alleged violations.

4. Since No. 77–1165 involves only an alleged error as to the date back pay should become effective and whether the discharge of the thirteen employees violated § 8(a)(3) of the Act, and by reason of the conclusions herein reached, we deem it unnecessary to give further consideration to No. 77–1165 for the reason that our action in No. 77–1630 will render the back pay issue moot. The employer will be referred to as "petitioner" and Local 250 will be specified in that name or as the "union".

For reasons stated herein, we disagree with the Board majority, substantially agreeing with the dissenting opinion, and grant the petition to review, set aside the order, and deny enforcement.

I

Petitioner, E. H., Limited d/b/a Earringhouse Imports, is a California corporation with its principal place of business in San Francisco. It is engaged in the wholesale and retail sale of earrings and other custom jewelry items. It conducts its wholesale business from a warehouse where goods are received, packaged, and prepared for sale to stores.

Nancy Pellerito, the petitioner's vice-president and treasurer, maintains an office in the warehouse where the thirteen affected employees were engaged in production work. The bargaining unit is defined as all warehouse employees at the San Francisco distribution center, excluding office (clerical), guards and supervisors as defined by the Act.

During the month of July, 1974, Pellerito was on vacation and did not return to work until July 29. By letter dated July 11, received by petitioner on July 15, Local 250 demanded recognition as the bargaining agent for the warehouse employees in the described unit.[5] On the same day the letter was received (July 15), the union filed a representation petition with the Board for an election. The Board scheduled a hearing for August 8, 1974 in San Francisco.[6]

The letter to Pellerito was brought to the attention of petitioner's president, Ben Lloyd, and its vice-president and secretary, Margaret Mahoma, neither of whom maintains an office at the warehouse nor takes any active part in the operation of the warehouse. On July 16, upon noting the contents of the letter, Lloyd telephoned the union and arranged a meeting for the following day, July 17.[7] At that meeting the union again stated its claim of majority representation and suggested several methods for third-party resolution of that issue. Lloyd replied that the union would be advised of petitioner's position but petitioner did not thereafter advise the union of its position with respect to the matter of recognition. In the interim, of course, the representation petition had been filed on July 15. The record is silent as to when petitioner received notice of the filing of the petition and Jacobs, the union's business agent and organizer, did not testify that he advised Lloyd as to the filing of the petition.

When Pellerito returned on July 29, she immediately convened a meeting of the warehouse employees. While there were apparently nineteen employees in the warehouse, the record is also silent as to how many were to be included in the bargaining unit although there are indications that sixteen would comprise the unit. It appears that at least three such employees were in a supervisory capacity.

The Board, crediting Pellerito's testimony,[8] found that Pellerito told the assembled employees that she was aware of the union's activities, asked them if they were sure that this particular union was the right union for them, added that she welcomed employees presenting their problems to her, and that she knew a hearing was scheduled. In response to a question as to whether the

5. The letter addressed to Pellerito (but not seen by her until her return from vacation) merely advised that a majority of the warehouse employees in the distribution center had designated the union as the authorized representative, and that the authorization cards could be inspected by a neutral party. It also advised Pellerito to reply within 48 hours.

6. There is some indication from the record that the hearing was originally scheduled for August 6, but it was postponed to August 8. This is of no importance to the decision.

7. Lloyd advised Jacobs, the union organizer, that he was not familiar with the subject matter.

8. The ALJ specifically credited Pellerito's testimony throughout. The Board, while pointing to certain conflicts in the evidence, rendered its decision and order predicated upon Pellerito's testimony. Thus, for our purposes, there is no dispute as to the facts.

employees should attend the hearing, she replied that she "did not know." She admits that she thereafter heard some employees discussing car pools for the purpose of attending the hearing but said nothing at that time.

On August 2, 1974, Pellerito conducted a second meeting with the employees. She advised that she had learned that it was not necessary for all the employees to attend the hearing, thereby stopping production, and she preferred to keep the business running. She told the employees that they were not to go to the hearing even though several remonstrated that they wanted to go as the hearing concerned them.[9]

At the request of two employees another meeting was convened during the afternoon of August 6. Certain employees repeated their prior request to be permitted to attend the hearing *en masse*. Pellerito again stated that they could not go and she wanted production to continue. The employees replied that "it concerned them." [10]

The following day, August 7—and one day prior to the scheduled representation hearing—Pellerito again convened the employees and read to them this statement:

Yesterday you said that you were all going to leave work to attend the NLRB hearing. I cannot allow all of the employees to go to the hearing since it will interrupt our production. Neither is it necessary for all of you to attend. We do have to continue business in this warehouse. I will agree to allow you to choose one representative from among you to attend the hearing. Please let me know your choice. If all of you attend without our permission, you will be considered as having quit or will be considered for discharge.

Likewise, Pellerito advised the employees that she wanted their breaks to remain normal and that they could have a few minutes to choose a representative to attend the hearing. Wendy Ball replied that it would take longer than five minutes. Pellerito responded by saying that the employees could choose a representative after work, and she urged them to return to work.[11] One employee raised a question about making up the time, and Pellerito replied by stating that the company did not work overtime and it could not be done.

On August 8 the hearing was conducted at the Federal Building in San Francisco. The thirteen employees left the warehouse around 9:25 a. m. to attend the hearing and signed out. None had permission to leave and no further notification was given to the employer as to any designated representative who would attend.[12] No employee was

9. On or about August 2, 1974, petitioner posted four "long-established" rules against solicitation and distribution proscribing (1) solicitation by employees during working time, (2) solicitation by employees on company premises after their shift's end, (3) distribution of literature of any type during working time, and (4) distribution of literature in working areas. The Board majority agreed with the ALJ that only the second rule violated the Act. The validity of the posted rules is not at issue in this proceeding and we may assume that the Board majority ruling remains in full force and effect as to these rules.

10. Also, on August 6, at approximately 9:10 a. m., during working hours, about half of the production employees left the warehouse to be photographed at the urging of the union representatives. They were advised by a supervisor that they could not leave during work time. Some employees replied that they would make up the time and left the warehouse, absenting themselves from work for about ten to fifteen minutes. Since the employees were not dis-

charged for this activity, we see no need to discuss it further.

11. The Board gives credence to testimony which indicates that, after Pellerito's offer to permit one representative to attend, Wendy Ball contacted the union's agent as to this latest development. She was advised by the union organizer that it was probably too late to issue any subpoena for the employees, that their testimony might prove necessary and that, in any event, the Act protected their right to attend. That night the employees unanimously voted to attend the hearing *en masse*. The employer was not advised as to this conversation with the union agent.

12. Prior to leaving for the hearing, a supervisor asked who their representative would be. Wendy Ball replied that they were all going to the hearing, that it concerned them. The supervisor referred the employees to what Pellerito had said on the previous day, that the company could not stop production, and warned

called as a witness, nor did any employee testify at the hearing.[13] The duration of the hearing, which apparently started around 10:15 a. m., was estimated at forty-five minutes to one hour. The employees were represented throughout the hearing by the union and its counsel. The employees returned to the warehouse about 12:50 p. m. and the time sheets reflect that at least one employee checked in, then went out to lunch, and returned at 1:51 p. m. The place of hearing was an approximate fifteen minute drive from the warehouse.

Production halted after the employees left with the company losing at least thirty-nine hours of work. Three production employees remained but packaging was stopped. August 8 was a Thursday and it was the practice of store managers to telephone their orders on Tuesdays and Thursdays of each week, with orders to be called in before noon. Six orders were called in that morning but could not be filled that day. August 8 was a deadline for a gift show and new store display but was not met. The cost value of merchandise handled by production employees was estimated at $2000 per day.

At approximately 3:00 p. m. on August 8, Pellerito summoned the thirteen affected employees and read to them the following statement: "Because you disobeyed the instructions I gave you yesterday and production here was stopped, I am dismissing you. You can pick up your checks in five minutes."

Among the thirteen discharged employees was one Podell as to whom the ALJ found that there was independent cause to discharge on August 7. Since Pellerito was

dealing with a much larger problem, she did not discharge Podell on August 7 although she had decided to terminate Podell for unauthorized absenteeism, falsifying time sheets and poor work habits.[14] Neither the majority nor minority dealt specifically with the Podell discharge; however she was included among the employees to be reinstated with reimbursement for her economic loss occasioned by the alleged wrongful discharge.

II

The Board's position, as stated by its counsel in oral argument, is that these employees were involved in a function of the government when they attended this representation hearing; that an employee has a protected right under § 8(a)(4) to attend a Board hearing or to otherwise participate in Board processes; that the burden is on the employer to show a legitimate business justification to limit the right of employees to attend a hearing during working hours; and that the Board, in balancing the interests of the employer and employee, must look primarily to the economic loss to be sustained by the employer by reason of the absence of the employee.

Although the majority decision mentions the fact that the employer agreed to let one representative attend the hearing, this fact is not discussed and apparently the Board deemed it irrelevant. In our view it is one of the controlling factors in this case.

It is conceded by all parties that the employer emphatically denied the request of the thirteen employees to attend the representation hearing, and that no consent to attend was expressly or impliedly given,

the employees that if they went to the hearing they would be considered as quitting. The employees nevertheless left for the hearing.

**13.** Counsel for the union conceded at argument that he did not attempt to interview any of the thirteen employees at any time prior to or during the hearing. There was some evidence that notes were handed to union counsel, the contents of which are unknown.

**14.** On August 3 the time sheets reveal that Podell signed in at 9:00 a. m. and out at 5:00 p.

m. She actually left early. When questioned on August 6 why her workload was so small, Podell replied that she left at 11:30 a.m. She indicated that she was sick and not responsible for her actions. Pellerito gave her a warning which was her third warning in three successive months. On August 7, Podell left work at 1:40 p. m., again without permission. Pellerito then decided to terminate her services but, on August 8, Podell was among the thirteen employees attending the hearing.

but the employer did offer to permit one representative as selected by the employees to attend. Members Fanning, Jenkins and Murphy comprised the majority in this case. The same panel, on May 5, 1978, decided *Supreme Optical Company, Inc.*, 235 NLRB No. 193 (1978), a case in which a supervisor had granted permission for five employees to attend a hearing before the Ohio Bureau of Unemployment Services where, indeed, all five employees testified although no subpoena had been issued. The employees were discharged upon their return to work. In upholding the ALJ's finding that the employer violated § 8(a)(1) of the Act by discharging five employees because they engaged in protected concerted activities, the Board noted in footnote 9:

> This is not to say that we would necessarily reach the same result if advance permission to be absent had not been sought and secured, since a balancing of the employee interest in protecting each other against the employer's interest in efficiently operating his business is required and the securing of permission is an important element in making the balance.

The Board majority does not mention its own precedents which support a contrary finding.[15] In *Standard Packaging Corporation, Royal Lace Paper Division*, 140 NLRB 628 (1963), the precise question was presented.[16] As stated by the Board, the issue in that case presented "a problem of accommodating the rights of employees in exercising rights guaranteed by the Act . . with the rights of an employer to regulate his production requirements and maintain discipline over his employees." Certain employees were anxious to attend a decertification hearing. The initial request, made the day before the scheduled hearing, was for six employees to be absent. The plant manager questioned the necessity for so

many attending, whereupon the request was reduced to four. After further discussion the number was reduced to two. These two attended, as did the remaining two who were later discharged. The Board said:

> We agree with the Trial Examiner that the Respondent did not engage in conduct proscribed by Section 8(a)(1), (3), and (4) of the Act, as alleged in the complaint, when it refused to grant employees Paul Murray and Charles Storms advance permission to absent themselves from work for purposes of attending a Board representation proceeding and thereafter discharged these employees when, in disregard of Respondent's directions, they absented themselves from work to attend the hearing.

The Board went further in *Standard Packaging Corporation* by noting (1) there was no evidence in the record which indicated any hostility on the part of the employer toward the collective activity of its employees,[17] (2) there was no *real need* for their appearance at the hearing otherwise demonstrated to the employer at the time their release was requested or at any later date before their discharge, and (3) the disciplinary action taken against Storms and Murray was not in reprisal for any protected activity on their part, but was motivated solely by the employees' absence from the plant in disregard of orders. Storms and Murray were not, of course, served with subpoenas.

It is significant to note that *Standard Packaging Corporation* involved a plant of 195 employees.[18] The general counsel argued that a request that four employees be permitted to be absent from work for a two hour period was a reasonable request and the burden of explaining its denial rested

---

15. The minority, members Penello and Walther, do discuss these prior decisions. Apparently, the Board majority is now seeking to reverse itself.

16. Member Fanning, one of the majority herein, participated in the decision in *Standard Packaging Corporation, Royal Lace Paper Division, supra.*

17. As in the case before us where there is not the slightest intimation of animus union activity. Even the majority decision does not suggest any animus.

18. In the present case we have sixteen production line employees with thirteen having attended the hearing.

upon the employer; and further that, as a "substantial production problem" was neither anticipated nor created by the absence of two additional employees on the hearing day, it was proper to infer that the employer, having failed to meet its burden in that regard, was motivated by a desire to obstruct the decertification activities of its employees. The Board did not discuss this contention other than to mention that the employer exhibited no hostility toward the collective activity of its employees. The trial examiner disposed of it by saying that no *prima facie* case had been made out, the burden of going forward with the evidence did not shift to the employer, and the reasonableness of the employer's action was but one factor to be weighed in resolving the question of motivation.

It is indeed strange that the Board majority did not see fit to mention *Standard Packaging Corporation* since it is factually identical and involves the same principles of law.[19] Obviously, the majority had examined the dissent as it is referred to by the majority. Without at least one overruling decision it is impossible for an ALJ or the legal field to keep abreast of the Board's views.

### III

Manifestly, the Board majority is attempting to enlarge, or take out of context, the decision in *N.L.R.B. v. Scrivener*, 405 U.S. 117, 92 S.Ct. 798, 31 L.Ed.2d 79 (1972),

where the Supreme Court upheld the Board for a violation of § 8(a)(4) of the Act when employees were discharged for giving written sworn statements to a field examiner investigating an unfair labor practice charge filed against the employer, although the employees neither filed the charges nor testified at a formal hearing thereon. While the principal issue was whether § 8(a)(4) encompassed the discharge of employees for giving written sworn statements to Board field examiners, the Court does consider some aspects of the provisions of § 8(a)(4) which protect an employee from discharge or discrimination if the employee has "given testimony under the Act." In holding that the existence of a subpoena is not crucial, the Court said: "Under this reasoning, if employees of Scrivener had been subpoenaed, they would have been protected. There is no basis for denying similar protection to the voluntary participant." But the Supreme Court in *Scrivener* was not confronted with wholly unnecessary employees who could add nothing to the hearing and whose only interest was that "the hearing involved them." It is apparent from the briefs, argument and common knowledge that Board representation hearings are not complex and, if the evidence develops a need for further testimony, the hearing is recessed, or a telephone call to the employer brings forth the additional required testimony of one or more employees.[20]

**19.** The Board's brief in the present case does attempt to distinguish *Standard Packaging Corporation* by saying that the employer and union had agreed that two named employees would attend *and that any others who were needed at the hearing would be released from work.* This is not what was said as indicated by the decision which states: "Wolff [the plant manager] again made it clear, however, that, if he were officially notified of the need for additional employees' appearance at the hearing, he would excuse not only these individuals but 'the whole plant.'" In the present case the only justification stated by the thirteen employees was that "the hearing involved them" or that they were "interested". They did not even advise the employer that the union organizer had suggested their attendance.

**20.** Ball testified that the employees wanted to attend the hearing "to talk about our own jobs"

and to give testimony "for our own job description." Pellerito denied that Ball had made this statement to her. The Board did not resolve this conflict in testimony except to note that Ball's testimony was essentially uncontradicted. The ALJ found that Pellerito knew nothing of the allegation that she planned to attack the rank-and-file status of the employees at the hearing, and the record did not support such a contention and was discredited. According to Ball, she overheard a conversation between Pellerito and an individual Ball assumed to be the employer's attorney which indicated that an effort would be made to eliminate twelve employees from the bargaining unit. Both Ball and Pellerito occupied enclosed offices, separated by approximately 200 feet. The alleged conversation was not included in Ball's post-representation hearing affidavit to the Board given on August 13. Pellerito, while admitting that she had discussed the case with her attor-

To uphold the Board majority in this case would result in complete disruption of an employer's productive ability. Presumably, business enterprises are operated in the expectation of some profit. The Board majority has invited employees—indeed all employees—to attend Board representation hearings during normal working hours and in violation of an express prohibition against leaving work at that time without the benefit of a subpoena or other showing that the employee's presence is required, unless the employer, upon whom the burden of proof is placed, can show substantial and legitimate business justification for requiring the employees to remain on the job. We cannot sanction such a pronouncement even though we acknowledge the Board's expertise in the field. In effect, as in this case, even where the employer's entire production line is shut down by reason of a mass exodus of employees, the Board majority suggests that this is not a substantial and legitimate business justification.

Bearing in mind that "working time is for work" we agree with the dissent that, absent any subpoena[21] or call from the Board to attend a hearing "unless employees can demonstrate substantial reasons for attending a Board hearing, unless there are compelling reasons urging their attendance, the employer's right to maintain normal operations should, and does, take precedence over the employees' right to leave work during regular working hours for such attendance or for any other purpose except that of legitimate strike activity" excluding, of course, an emergency with which we are not concerned in this case.

In placing the burden upon the employer to come forward with evidence of legitimate and substantial business justification for its act—even if the employer is free from violation of the Act and there is no explicit discriminatory motive shown—the Board majority relied upon *N.L.R.B. v. Great Dane Trailers*, 388 U.S. 26, 33–34, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967).[22] The

---

ney at his office, expressly denied discussing the case with her attorney at the warehouse or by telephone. Since the ALJ fully credited Pellerito's testimony, and the Board did not see fit to expressly deal with this factual situation, we can assume that the Board's established policy not to overrule the resolutions with respect to credibility of the ALJ, unless the clear preponderance of all of the relevant evidence convinces the Board that the resolutions are incorrect, would be applicable. *Standard Dry Wall Products, Inc.*, 91 NLRB 544 (1950), enf'd 188 F.2d 362 (3rd Cir. 1951); *Supreme Optical Company, Inc.*, 235 NLRB 193 (1978), footnote 1.

21. We recognize that the adoption of the Board minority view may result in the issuance of more subpoenas than would ordinarily be required. It is suggested that union counsel may subpoena *all* employees of a given employer. We have more faith in union counsel handling labor matters and, should that occur, the ALJ may revoke the subpoenas or otherwise impose sanctions.

22. *N.L.R.B. v. Great Dane Trailers, supra,* involved a violation of §§ 8(a)(3) and (1) of the Act where an employer refused to pay vacation benefits to striking employees accrued under a terminated collective bargaining agreement and, at the same time, the employer announced that it would pay these benefits to striker replacements, returning strikers and nonstrikers who worked on July 1, 1963 during the strike. In *Great Dane Trailers* the Board and the Fifth

Circuit held that discrimination between striking and non-striking employees had been established, but the Fifth Circuit ruled that an affirmative showing of an unlawful motivation to discourage union membership or interfere with the exercise of protected rights was required. *Great Dane Trailers* made no effort to show any legitimate business purpose underlying its discriminatory action but the Fifth Circuit speculated that its motivation may have been (1) to reduce expenses; (2) to encourage longer tenure among present employees; or (3) to discourage early leaves immediately before vacation periods. The court of appeals denied enforcement of the order because of the possibility that such motives were sufficient to overcome the inference of improper motive which flowed from the conduct.

The Supreme Court reversed, holding that discrimination had clearly been shown in this § 8(a)(3) charge and, under the circumstances, since the conduct fell within the "inherently destructive" category, the employer has the burden of explaining away, justifying or characterizing "his actions as something different than they appear on their face," and if he fails, "an unfair labor practice charge is made out." The Supreme Court went further and said that even if the employer comes forward with counter explanations for his conduct, the Board may nevertheless draw an inference of improper motive from the conduct itself and exercise its

*Great Dane Trailers* case was a § 8(a)(3) discrimination case and did not attempt to deal with a § 8(a)(4) situation. Manifestly, from the majority and dissenting opinions, it is clear that the rule announced in *Great Dane Trailers* was intended to be limited to § 8(a)(3) violations. We do not feel free to extend the same rule to an alleged violation of § 8(a)(4) as was done by the Board majority.

■ The Board majority has seized upon the language in *Great Dane Trailers*, taken out of context, to support its view that the burden is upon the employer to come forward with evidence of "legitimate and substantial business justification" for its conduct if it is not to be found to have violated the Act. We do not agree that *Great Dane Trailers* can be given this interpretation in a § 8(a)(4) case where discrimination is not in issue. The precedent authorities in *Great Dane Trailers* are, in the main, *Labor Board v. Erie Resistor Corp.*, 373 U.S. 221, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963), and *Labor Board v. Brown*, 380 U.S. 278, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965). Each is a § 8(a)(3) case where "both discrimination and a resulting discouragement of union membership are necessary," *Labor Board v. Brown, supra*, at 286, 85 S.Ct. at 985, and the " 'real motive' of the employer in an alleged § 8(a)(3) violation is decisive." *Id.* at 287, 85 S.Ct. at 985–986. In *Brown*, the Supreme Court went further and said: "When the resulting harm to employee rights is thus comparatively slight, and a substantial and legitimate business end is served, the employers' conduct is *prima facie* lawful." Bearing in mind that the employer in the present case had volunteered to permit one representative to attend the

hearing, and considering the nature of a Board representation hearing with its flexible alternatives with respect to a witness testifying, it is indeed difficult to find that the resulting harm is anything more than *de minimis*. Assuredly, the employer's conduct was *prima facie* lawful and, we feel, convincingly so.

### IV

■ Assuming *arguendo* that the Board majority was correct in applying the burden of proof rule in a § 8(a)(4) case and imposing this burden upon the employer, we nevertheless feel that the Board majority findings on the ultimate factual question are not supported by substantial evidence on the record considered as a whole. We are not unmindful of the fact that there is only limited judicial review of such findings but the Supreme Court in *Labor Board v. Brown, supra*, at 290–292, 85 S.Ct. at 988, pointedly stated that the phrase "limited judicial review" did *not* mean that the balance struck by the Board was immune from judicial examination and reversal in proper cases, and "where, as here, the review is not a question of fact, but of judgment as to the proper balance to be struck between the conflicting interests, the deference owed to an expert tribunal cannot be allowed to slip into a judicial inertia which results in the unauthorized assumption by an agency of major policy decisions properly made by Congress." Such is the case before us in examining the attempts to balance the conflict of interest between the employer and employees.

The Board majority agrees that "there were no terribly important reasons or exi-

---

duty to strike the proper balance between the asserted business justifications and the invasion of employee rights. The Court then announced two principles: (1) if it can be reasonably concluded that the employer's discriminatory conduct was "inherently destructive" of important employee rights, no proof of an antiunion motivation is needed and the Board can find an unfair labor practice even if the employer introduces evidence that the conduct was motivated by business considerations; and (2) if the adverse effect of the discriminatory

conduct on employee rights is "comparatively slight," an antiunion motivation must be proved to sustain the charge if the employer comes forward with evidence of legitimate and substantial business justifications for the conduct. In either situation, the Supreme Court said, once discriminatory conduct which could adversely affect employee rights to *some* extent has been shown, the burden is upon the employer to establish that he was motivated by legitimate objectives since proof of motivation is most accessible to him.

gencies crying out for employee attendance at the hearing," but they hold that since the employees were engaged in protected activity, an employer's interference with it requires more justification than his performance or inconsequential inconvenience. The majority refers to three reasons why the employer has not shown that the absence of thirteen of the sixteen production employees would not cause anything more than inconsequential inconvenience, although they at no time challenge the fact that production stopped when the thirteen employees walked out to attend the hearing. The majority suggests (1) Pellerito never told the employees that she feared serious business or economic consequences by reason of the employees' absence from work; (2) Pellerito rejected the employees' offer to make up the time lost; and (3) her discharge of the employees at 3:00 p. m., rather than waiting until 5:00 p. m. quitting time, was inconsistent with her professed concern about maintaining production. We think these arguments are specious.

The majority found that Pellerito did say that "she wanted production to continue and the business to go on." What further conceivable reason need an employer give to employees who express a desire to absent themselves from work *en masse* for no apparent necessity? With a large and wealthy corporate employer, a loss of one-half day may, in fact, be miniscule but it is assuredly the employer's right to see to it that production is not stopped.

The offer to make up the lost time is also a decision vested in the employer. While the Board attempts to emphasize this point, we note in footnote 5 of its majority decision it is said: "Ball was not, of course, proposing that the employees work overtime." In one breath the Board majority finds that a specific offer to work overtime was made; in another comment the same majority holds that the proposal to work overtime was not specific.

Lastly, the Board majority cites the 3:00 p.m. discharge as evidence that Pellerito

was not concerned with the extent of production. When confronted with obvious insubordination, and to prevent a defense of condonement, it is essential that the employer act promptly.[23] The ALJ held "the fact of the loss was clearly established at trial." The Board majority stated that there was an "insufficient basis on which to predicate any conclusion that business or economic hardship or loss was a direct consequence of the employees' leaving work." The dissenting members stated, and we agree: "The successful functioning of a business enterprise requires, rather obviously, the presence of employees on the job during working hours. It would also seem equally evident that employee absence is inherently disruptive and unexcused absence has, of course, usually been considered, absent a legitimate strike, proper grounds for discharge."

■ Thus, we conclude that, assuming *arguendo* the correctness of the Board majority ruling that the burden was on the employer in this § 8(a)(4) case, under the undisputed facts in this case, the employer met the burden by the admitted fact that all production stopped and a loss was inevitable.

### V

The Board urges that the employer improperly refused to accord recognition to the union after being advised that the union had received a sufficient number of executed authorization cards. Stated otherwise, the Board asserts that had the employer agreed to the procedures available for determining whether the union represented a majority of the employees, no representation hearing would have been required and the employees would have remained at work on August 8.

■ This issue was resolved in a case from this court, *Linden Lumber Division v. N. L. R. B.,* 419 U.S. 301, 95 S.Ct. 429, 42 L.Ed.2d 465 (1974). It is not the employer's obligation to petition for an election, al-

---

**23.** Indeed, with respect to the employees absenting themselves on the morning of August 6 to have their photographs taken, the ALJ found that the employer had condoned this activity.

though it has the *option* to do so. In the present case the union had already filed on July 15 a representation petition for an election—the same day the employer initially received word of the executed authorization cards. In *N. L. R. B. v. Gissel Packing Co.*, 395 U.S. 575, 603, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), the Supreme Court held the election process had acknowledged superiority in ascertaining whether a union has majority support. Since the only claimed unfair labor practice on the part of the employer centers around the discharge of the thirteen employees—a charge which we have rejected—there was no obligation on the employer's part to bargain.

*No. 77–1165, Petition for Review and Enforcement DENIED.*

*No. 77–1630, Petition for Review GRANTED, Order VACATED, and Enforcement DENIED.*

MacKINNON, Circuit Judge, concurring:

I concur fully in Judge Hoffman's opinion but feel it necessary to direct attention to a few points mentioned by the dissent.

First, the dissent holds that the employer was duty bound to engage in a full blown economic discussion with the employees as to why closing down the plant in the middle of the day should have "potentially serious adverse consequences to the business . . ." Any reasonably intelligent employee would know the adverse consequences of such a shut-down.[1] Overhead and operating costs continue, supervisors continue to be paid (despite the absence of employees) and the

production of goods to fill orders is delayed to the dissatisfaction of customers. The employees of the plant were on full notice of how serious the company considered the matter to be when their superiors notified them, before they left to attend the hearing, that they would be discharged if they absented themselves from work merely to attend the hearing as spectators.

Second, the offer to make up "time lost" obviously meant working beyond regular working hours.[2] This plainly involved the supervisors, executives and any nonabsenting employees also working overtime to the further economic loss of the employer. In this decision there is nothing inconsistent with the employer's concern about lost production.

Finally, firing the recalcitrant employees when they returned, two hours before normal quitting time, indicates that the employer placed his right to manage his plant above his concern for two hours production.[3] That was his right. He had warned the employees of such consequence and he had a right to carry out his warning. A far different situation would have been created if the employees' presence was required at the hearing, but it was not. The employer's offer to permit them to send a representative, which was also unnecessary, was more than reasonable.

The dissent states that the case involves determining "how best, in light of competing considerations such as the exigencies of running a business, to vindicate the right of

---

1. This statement does not contradict the factual record. The dissent comments upon this inference from the record but fails to indicate in what respect the adverse consequences would not be perfectly obvious to any reasonably intelligent employee. See dissent, footnote 10. Triers make findings of fact and appellate courts, that are required to interpret such records, may indulge in such presumptions as are "natural and probable and such as ought to be drawn from the facts actually found by the court below," *Bear Lake Irrigation Co. v. Garland,* 164 U.S. 1, 25, 17 S.Ct. 7, 14, 41 L.Ed. 327 (1896), including facts that the appellate court concludes the parties "would know" from the facts stated. 164 U.S. at 23, 17 S.Ct. 7. An appellate court may also "make the inference"

from "[t]he facts found," *Harrison v. Perea,* 168 U.S. 311, 324, 18 S.Ct. 129, 42 L.Ed. 478 (1897), and interpret the record to the extent that "it seems plain." *Apache County v. Barth,* 177 U.S. 538, 547, 20 S.Ct. 718, 44 L.Ed. 878 (1900).

2. The dissent also fails to share with us in what respect the offer of the whole staff to "work overtime" would not involve the consequences which are outlined. See dissent, footnote 10, and n. 1, *supra.*

3. The dissent fails to indicate how ordering the plant closed during normal working hours is not correctly characterized as a "management" decision. See dissent, footnote 10, and n. 1, *supra.*

employees to participate in NLRB proceedings." The discussion in the dissent, however, focuses solely on the employees' right, without giving due consideration to the employer's right to manage his business. The rights of the employees and of the employer should be considered together. The employer's offer to excuse any representative the employees would elect to attend the hearing as their representative took *both* factors into consideration and was *more* than was required by either party to the hearing. This does not "eviscerate" any employee right. It merely recognizes that employees acting contrary to an employer's express order have no right *en masse* to quit work in the middle of the day to attend an administrative labor board hearing when their presence was not requested or required either formally or informally by the agency, their employer, or their union.

Judge Hoffman's opinion recognizes that when no party to a labor board hearing requires or requests employees to attend, and the employees do not testify as witnesses or participate in the hearing, the employer's right to the regular operation of his plant takes precedence over any claimed right merely to attend as spectators, unless the employees have substantial and compelling reasons or an emergency or strike exists. This recognition places the rights of the employer, the employees and the public in perfect balance.

The dissent's objection concerning the burden of proof is unfounded; the court's decision invokes nothing more than the customary burden borne by the proponent in an unfair labor practice proceeding. *See, e. g., Labor Board v. Brown,* 380 U.S. 278, 288–89, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965); *Portland Willamette Co. v. NLRB,* 534 F.2d 1331, 1334–35 (9th Cir. 1976); *NLRB v. United Brotherhood of Carpenters & Joiners,* 531 F.2d 424, 426 (9th Cir. 1976); *NLRB v. Fibers International Corp.,* 439 F.2d 1311, 1315 (1st Cir. 1971). In rejecting the customary burden, the Board majority

cited no authority directly on point, but relied on *NLRB v. Great Dane Trailers, Inc.,* 388 U.S. 26, 33–34, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967). J.A. 254. *Great Dane,* however, involved a § 8(a)(3) case in which the employer's discrimination against striking employees had been established; the employer then bore the burden of establishing that he was motivated by legitimate business objectives. To apply *Great Dane* in this § 8(a)(4) action so as to alter the burden of proof where there is no showing of discrimination finds no support in law.[4]

Judge Hoffman's discussion of business justification sets forth an alternative holding that, even if the burden was on the employer, that burden was met because all production was stopped, and loss was inevitable, from the departure of the bulk of the work force. This holding does not, as the dissent claims, ignore the limited nature of review of the Board's factual determinations, but rather is based upon the undisputed fact that production came to a halt. That fact taken in perspective affects the balance struck between the employer's right to maintain production and the employees' right to participate in Board proceedings, particularly where such participation was not necessary. Ignoring the fact that production stopped, the Board instead drew unsupported conclusions that the employer failed to warn the employees of any economic consequences of their departure *en masse,* and acted inconsistently with production concerns in rejecting the offer to make up time and in discharging the employees promptly upon their return rather than at the end of the work day. J.A. 250–51. In the face of the employer's refusal of permission for *en masse* departure so that production could continue, and the offer to allow the employees to send a representative to the hearing, a proper accommodation in this case favors the employer's legitimate interest in operating his business without unnecessary disruption.

---

4. One commentator notes that *Great Dane* has been uniformly interpreted by the Circuit Courts as placing the burden of going forward with the evidence on the employer, upon a showing of discrimination in a § 8(a)(3) action; the ultimate burden of proof remains with the General Counsel. 3 T. Kheel, *Labor Law* § 12.03[8].

**J. SKELLY WRIGHT, Chief Judge, dissenting:**

I would affirm for the reasons stated in the Board's opinion.[1]

The Board reasoned that,

> under a proper construction of Section 8(a)(4)[,] an employee may not lawfully be discharged after participation in any Board proceeding during his regular working hours (a) where an employer can establish no business necessity justifying a requirement that the employee stay on the job or (b) where a business justification is established but which in the particular circumstances is not on balance sufficient to overcome the employee's assertion of his right to attend or participate. * * * [2]

Applying this bipartite test, the employer's discharge of the employees in this case was held by the NLRB to be unlawful. First, the Board found that the employer never told the employees, when denying them permission to attend the NLRB hearing, that potentially serious adverse consequences to the business underlay the denial.[3] Second, the employer's rejection of the employees' bid to make up time lost due to attendance at the hearing was deemed inconsistent with any conclusion that the employer was truly concerned about lost production.[4] Finally, the Board found that the employer's discharge of the employees took place two hours before the regular quitting time, rather than at the end of the work day, a fact also inconsistent with an underlying concern to maintain production.[5]

My colleagues in the majority, however, rather than deferring to the Board's judgment on how best, in light of competing considerations such as the exigencies of running a business, to vindicate the right of employees to participate in NLRB proceedings, have substituted both a different test and a different view of the facts for those of the Board, and in the process have threatened to eviscerate the employees' right. As formulated by the majority, the test reads:

> Bearing in mind that "working time is for work" we [hold] that, absent any subpoena or call from the Board to attend a hearing[,] "unless employees can demonstrate substantial reasons for attending a Board hearing, unless there are compelling reasons urging their attendance, the employer's right to maintain normal operations should, and does, take precedence over the employees' right to leave work during regular working hours for such attendance or for any other purpose except that of legitimate strike activity" excluding, of course, an emergency with which we are not concerned in this case.[6]

As can readily be seen, the majority has turned the NLRB's test on its head. That is to say, rather than imposing the burden of proof on the employer whose action threatens to deprive employees of their right to participate in NLRB proceedings, the majority imposes on the employees the burden of showing why their employer must refrain from denying them their right. As the Board, commenting on this viewpoint, stated, "[W]e consider it anomalous to require the possessor of a right to come forward with 'compelling reasons' to justify the exercise of the right." [7]

---

1. The majority opinion of Chairperson Murphy and Members Jenkins and Fanning is reprinted at Joint Appendix (JA) 244–261. The dissenting opinion of Members Penello and Walther is reprinted at JA 262–269.

2. JA 249–250.

3. JA 250.

4. JA 250–251.

5. JA 251.

6. Majority opinion, 195 U.S.App.D.C. at ——, 600 F.2d at 938 (*quoting* dissenting opinion of

Members Penello and Walther) (footnote omitted).

7. JA 254. As a general rule, "[t]he construction put on a statute by the agency charged with administering it is entitled to deference by the courts, and ordinarily that construction will be affirmed if it has a 'reasonable basis in law.'" *Volkswagenwerk v. FMC*, 390 U.S. 261, 272, 88 S.Ct. 929, 935, 19 L.Ed.2d 1090 (1968), *quoted in SEC v. Sloan*, 436 U.S. 103, 118, 98 S.Ct. 1702, 56 L.Ed.2d 148 (1978).

This court's majority in this case not only supplies an ill-considered test to replace the NLRB's more reasoned version, but also substitutes its view of the facts for that of the Board. The Board interpreted the facts regarding the employer's behavior as inconsistent with the proffered rationale for refusing to permit the employees' attendance at the hearing—that is, economic necessity. The majority, however, writes that, even if the Board's test were proper, the facts indicate that the employer acted lawfully in discharging the employees; that is, that economic necessity was the basis of the employer's refusal to permit the employees' attendance.[8] This holding by the majority ignores the limited nature of our review of the Board's factual determinations.[9] If there is substantial evidence in the record to support the Board's factual findings, as clearly there is here, reviewing courts must refrain from upsetting those findings.[10]

I respectfully dissent.

---

8. Majority opinion, 195 U.S.App.D.C. at ——– ——, 600 F.2d at 939–940.

9. 29 U.S.C. § 160(e) (1976); see, e.g., Packard Motor Co. v. NLRB, 330 U.S. 485, 491, 67 S.Ct. 789, 91 L.Ed. 1040 (1947).

10. Judge MacKinnon's concurring opinion demonstrates the extent to which the majority is willing to substitute its view of the facts for that of the NLRB. Thus he informs the reader that "[a]ny reasonably intelligent employee would know the adverse consequences of [temporarily closing the plant]." Concurring opinion, 195 U.S.App.D.C. at ——, 600 F.2d at 941. He also intuits what the employees' "offer to make up 'time lost' obviously meant," and he shares his intuition with us. Id., 195 U.S.App. D.C. at ——, 600 F.2d at 941 (emphasis in original). And he divines from the employer's dismissal of the employees two hours prior to normal closing a judgment on the part of the employer in favor of "manag[ing] his plant." Id.