# LINDEN LUMBER DIVISION, SUMMER & CO. *v.* NATIONAL LABOR RELATIONS BOARD ET AL.

No. 73–1231.   Argued November 18, 1974—
Decided December 23, 1974*

Douglas, J., delivered the opinion of the Court, in which Burger, C. J., and Brennan, Blackmun, and Rehnquist, JJ., joined. Stewart, J., filed a dissenting opinion, in which White, Marshall, and Powell, JJ., joined, *post,* p. 310.

*Norton J. Come* argued the cause for the National Labor Relations Board, respondent in No. 73–1231 and petitioner in No. 73–1234.   With him on the brief were *Solicitor General Bork, Peter G. Nash, John S. Irving,* and *Patrick Hardin.   Lawrence M. Cohen* argued the cause for petitioner in No. 73–1231.   With him on the briefs were *Steven R. Semler* and *Ronald F. Hart-*

*Together with No. 73–1234, *National Labor Relations Board* v. *Truck Drivers Union Local No. 413 et al.,* also on certiorari to the same court.

*man. Laurence Gold* argued the cause and filed a brief for respondent unions in both cases.†

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

These cases present a question expressly reserved in *NLRB* v. *Gissel Packing Co.,* 395 U. S. 575, 595, 601 n. 18 (1969).

In *Linden* respondent union obtained authorization cards from a majority of petitioner's employees and demanded that it be recognized as the collective-bargaining representative of those employees. Linden said it doubted the union's claimed majority status and suggested the union petition the Board for an election. The union filed such a petition with the Board but later withdrew it when Linden declined to enter a consent election agreement or abide by an election, on the ground that respondent union's organizational campaign had been improperly assisted by company supervisors. Respondent union thereupon renewed its demand for collective bargaining; and again Linden declined, saying that the union's claimed membership had been improperly influenced by supervisors. Thereupon respondent union struck for recognition as the bargaining representative and shortly filed a charge of unfair labor practice against Linden based on its refusal to bargain.

There is no charge that Linden engaged in an unfair labor practice [1] apart from its refusal to bargain. The

---

†*Gerard C. Smetana, Jerry Kronenberg,* and *Milton Smith* filed a brief for the Chamber of Commerce of the United States as *amicus curiae* urging reversal.

[1] At the conclusion of the strike Linden refused to reinstate two employees it alleged to be supervisors and therefore unprotected by the Act. The Board found that to be an unfair labor practice. Thereupon Linden reinstated the two employees and this issue was not tendered to the court below. 159 U. S. App. D. C. 228, 234, 487 F. 2d 1099, 1105 (1973).

Board held that Linden should not be guilty of an unfair labor practice [2] solely on the basis "of its refusal to accept evidence of majority status other than the results of a Board election." 190 N. L. R. B. 718, 721 (1971).

In *Wilder* [3] there apparently were 30 employees in the plant, and the union with 11 signed and two unsigned authorization cards requested recognition as the bargaining agent for the company's production and maintenance employees. Of the 30 employees 18 were in the production and maintenance unit which the Board found to be appropriate for collective bargaining. No answer was given by the employer, Wilder, and recognitional picketing began. The request was renewed when the two unsigned cards were signed, but Wilder denied recognition. Thereupon the union filed unfair labor practice charges against Wilder. A series of Board decisions and judicial decisions, not necessary to recapitulate here, consumed about seven years until the present decision by the Court of Appeals. [4] The Board made the same ruling as respects Wilder as it did in Linden's case. See 198 N. L. R. B. 998 (1972). On petitions for review the Court of Appeals reversed. 159 U. S. App. D. C. 228, 487 F. 2d 1099 (1973). We reverse the Court of Appeals.

In *Gissel* we held that an employer who engages in "unfair" labor practices " 'likely to destroy the union's

---

[2] Section 8 (a) (5) of the National Labor Relations Act provides:
"(a) It shall be an unfair labor practice for an employer—

.     .     .     .     . —

"(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 9 (a)." 49 Stat. 453, as amended, 61 Stat. 141, 29 U. S. C. § 158 (a) (5).

[3] See n. 4, *infra*.

[4] The long series of rulings is described in the opinion of the Court of Appeals, 159 U. S. App. D. C., at 229–232, 487 F. 2d, at 1100–1103. Wilder did not petition for certiorari. No. 73–1234, which we granted, is the petition of the Board, but for convenience it is referred to herein as the *Wilder* case.

majority and seriously impede the election'" may not insist that before it bargains the union get a secret ballot election. 395 U. S., at 600. There were no such unfair labor practices here, nor had the employer in either case agreed to a voluntary settlement of the dispute and then reneged. As noted, we reserved in *Gissel* the questions "whether, absent election interference by an employer's unfair labor practices, he may obtain an election only if he petitions for one himself; whether, if he does not, he must bargain with a card majority if the Union chooses not to seek an election; and whether, in the latter situation, he is bound by the Board's ultimate determination of the card results regardless of his earlier good faith doubts, or whether he can still insist on a Union-sought election if he makes an affirmative showing of his positive reasons for believing there is a representation dispute." *Id.,* at 601 n. 18.

We recognized in *Gissel* that while the election process had acknowledged superiority in ascertaining whether a union has majority support, cards may "adequately reflect employee sentiment." *Id.,* at 603.

Generalizations are difficult; and it is urged by the unions that only the precise facts should dispose of concrete cases. As we said, however, in *Gissel,* the Board had largely abandoned its earlier test that the employer's refusal to bargain was warranted, if he had a good-faith doubt that the union represented a majority. A different approach was indicated. We said:

"[A]n employer is not obligated to accept a card check as proof of majority status, under the Board's current practice, and he is not required to justify his insistence on an election by making his own investigation of employee sentiment and showing affirmative reasons for doubting the majority status. See *Aaron Brothers,* 158 N. L. R. B. 1077, 1078. If he

does make an investigation, the Board's recent cases indicate that reasonable polling in this regard will not always be termed violative of § 8 (a)(1) if conducted in accordance with the requirements set out in *Struksnes Construction Co.,* 165 N. L. R. B. [1062], 65 L. R. R. M. 1385 (1967). And even if an employer's limited interrogation is found violative of the Act, it might not be serious enough to call for a bargaining order. See *Aaron Brothers, supra; Hammond & Irving, Inc.,* 154 N. L. R. B. 1071 (1965). As noted above, the Board has emphasized that not 'any employer conduct found violative of Section 8 (a)(1) of the Act, regardless of its nature or gravity, will necessarily support a refusal-to-bargain finding,' *Aaron Brothers, supra,* at 1079." 395 U. S., at 609–610.

In the present cases the Board found that the employers "should not be found guilty of a violation of Section 8 (a) (5) solely upon the basis of [their] refusal to accept evidence of majority status other than the results of a Board election." 190 N. L. R. B., at 721; see 198 N. L. R. B., at 998. The question whether the employers had good reasons or poor reasons was not deemed relevant to the inquiry. The Court of Appeals concluded that if the employer had doubts as to a union's majority status, it could and should test out its doubts by petitioning for an election. It said:

"While we have indicated that cards alone, or recognitional strikes and ambiguous utterances of the employer, do not necessarily provide such 'convincing evidence of majority support' so as to require a bargaining order, they certainly create a sufficient probability of majority support as to require an employer asserting a doubt of majority status to resolve the possibility through a petition

for an election, if he is to avoid both any duty to bargain and any inquiry into the actuality of his doubt." 159 U. S. App. D. C., at 240, 487 F. 2d, at 1111.

To take the Board's position is not to say that authorization cards are wholly unreliable as an indication of employee support of the union. An employer concededly may have valid objections to recognizing a union on that basis. His objection to cards may, of course, mask his opposition to unions. On the other hand he may have rational, good-faith grounds for distrusting authorization cards in a given situation. He may be convinced that the fact that a majority of the employees strike and picket does not necessarily establish that they desire the particular union as their representative. Fear may indeed prevent some from crossing a picket line; or sympathy for strikers, not the desire to have the particular union in the saddle, may influence others. These factors make difficult an examination of the employer's motive to ascertain whether it was in good faith. To enter that domain is to reject the approval by *Gissel* of the retreat which the Board took from its "good faith" inquiries.

The union which is faced with an unwilling employer has two alternative remedies under the Board's decision in the instant cases. It can file for an election; or it can press unfair labor practice charges against the employer under *Gissel*. The latter alternative promises to consume much time. In *Linden* the time between filing the charge and the Board's ruling was about 4½ years; in *Wilder*, about 6½ years. The Board's experience indicates that the median time in a contested case is 388 days. *Gissel*, 395 U. S., at 611 n. 30. On the other hand the median time between the filing of the petition for an election and the decision of the Re-

gional Director is about 45 days.[5]   In terms of getting on with the problems of inaugurating regimes of industrial peace, the policy of encouraging secret elections under the Act is favored.   The question remains—should the burden be on the union to ask for an election or should it be the responsibility of the employer?

The Court of Appeals concluded that since Congress in 1947 authorized employers to file their own representation petitions by enacting § 9 (c)(1)(B),[6] the burden was on them.   But the history of that provision indicates it was aimed at eliminating the discrimination against employers which had previously existed under the Board's prior rules, permitting employers to petition for an election only when confronted with claims by two or more unions.[7]   There is no suggestion that Congress wanted to place the burden of getting a secret election on the employer.

"Today an employer is faced with this situation.

---

[5] Thirty-seventh Annual Report of the National Labor Relations Board 13 (1972).

[6] Section 9 (c)(1)(B) provides:

"(1) Whenever a petition shall have been filed, in accordance with such regulations as may be prescribed by the Board—

"(B) by an employer, alleging that one or more individuals or labor organizations have presented to him a claim to be recognized as the representative defined in section 9 (a);

"the Board shall investigate such petition and if it has reasonable cause to believe that a question of representation affecting commerce exists shall provide for an appropriate hearing upon due notice. Such hearing may be conducted by an officer or employee of the regional office, who shall not make any recommendations with respect thereto. If the Board finds upon the record of such hearing that such a question of representation exists, it shall direct an election by secret ballot and shall certify the results thereof."   61 Stat. 144, 29 U. S. C. § 159 (c)(1)(B).

[7] S. Rep. No. 105, 80th Cong., 1st Sess., 10–11 (1947); 93 Cong. Rec. 3838 (1947).

A man comes into his office and says, 'I represent your employees. Sign this agreement, or we strike tomorrow.' Such instances have occurred all over the United States. The employer has no way in which to determine whether this man really does represent his employees or does not. The bill gives him the right to go to the Board under those circumstances, and say, 'I want an election. I want to know who is the bargaining agent for my employees.' " 93 Cong. Rec. 3838 (1947) (remarks of Senator Taft).

Our problem is not one of picking favorites but of trying to find the congressional purpose by examining the statutory and administrative interpretations that incline one way or another. Large issues ride on who takes the initiative. A common issue is, what should be the representative unit? In *Wilder* the employer at first took the position that the unit should be one of 30 employees. If it were 18, as the union claimed (or even 25 as the employer later argued), the union with its 13 authorization cards (assuming them to be valid) would have a majority. If the unit were 30, the union would be out of business.

Section 9 (c)(1)(B) visualizes an employer faced with a claim by individuals or unions "to be recognized as the representative defined in § 9 (a)." [8] That question of representation is raised only by a claim that the applicant represents a majority of employees, "in a unit appro-

---

[8] Section 9 (a) provides:

"Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment . . . ." 49 Stat. 453, as amended, 61 Stat. 143, 29 U. S. C. § 159 (a).

priate for such purposes." § 9 (a). If there is a significant discrepancy between the unit which the employer wants and the unit for which the union asked recognition, the Board will dismiss the employer's petition. *Aerojet-General Corp.*, 185 N. L. R. B. 794 (1970); *Bowman Bldg. Products Div.*, 170 N. L. R. B. 312 (1968); *Amperex Electronic Corp.*, 109 N. L. R. B. 353 (1954); *Wm. Wood Bakery, Inc.*, 97 N. L. R. B. 122 (1951). In that event the union, if it desired the smaller unit, would have to file its own petition, leaving the employer free to contest the appropriateness of that unit. The Court of Appeals thought that if the employer were required to petition the Board for an election, the litigable issues would be reduced. The recurring conflict over what should be the appropriate bargaining unit, coupled with the fact that if the employer asks for a unit which the union opposes his election petition is dismissed, is answer enough.

The Board has at least some expertise in these matters and its judgment is that an employer's petition for an election, though permissible, is not the required course. It points out in its brief here that an employer wanting to gain delay can draw a petition to elicit protests by the union, and the thought that an employer petition would obviate litigation over the sufficiency of the union's showing of interest is in its purview apparently not well taken. A union petition to be sure must be backed by a 30% showing of employee interest. But the sufficiency of such a showing is not litigable by the parties.[9]

In light of the statutory scheme and the practical administrative procedural questions involved, we cannot say that the Board's decision that the union should go forward and ask for an election on the employer's refusal

---

[9] *NLRB* v. *Savair Mfg. Co.*, 414 U. S. 270, 287 n. 6 (1973) (WHITE, J., dissenting).

to recognize the authorization cards was arbitrary and capricious or an abuse of discretion.

In sum, we sustain the Board in holding that, unless an employer has engaged in an unfair labor practice that impairs the electoral process,[10] a union with authorization cards purporting to represent a majority of the employees, which is refused recognition, has the burden of taking the next step in invoking the Board's election procedure.

*Reversed.*

MR. JUSTICE STEWART, with whom MR. JUSTICE WHITE, MR. JUSTICE MARSHALL, and MR. JUSTICE POWELL join, dissenting.

Under a recently adopted Board policy, an employer who does not commit independent unfair labor practices prejudicing the holding of a fair election has an absolute right to refuse to bargain with a union selected by a majority of his employees until that union petitions for and wins a Board-supervised election. I cannot agree with the Court's conclusion that this Board policy constitutes a permissible interpretation of §§ 8 (a)(5) and 9 (a) of the Act.[1] Accordingly, I would affirm the judg-

---

[10] We do not reach the question whether the same result obtains if the employer breaches his agreement to permit majority status to be determined by means other than a Board election. See *Snow & Sons,* 134 N. L. R. B. 709 (1961), enf'd, 308 F. 2d 687 (CA9 1962). In the instant cases the Board said that the employers and the unions "never voluntarily agreed upon any mutually acceptable and legally permissible means, other than a Board-conducted election, for resolving the issue of union majority status." 190 N. L. R. B., at 721; see 198 N. L. R. B., at 998.

[1] Section 9 (a) of the Act, 49 Stat. 453, as amended, 61 Stat. 143, 29 U. S. C. § 159 (a), provides that "[r]epresentatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees . . . ." Section

ment of the Court of Appeals remanding the case to the Board for further proceedings, although my views are somewhat at variance with those expressed in the Court of Appeals' opinion.

Section 9 (a) expressly provides that the employees' exclusive bargaining representative shall be the union "designated or selected" by a majority of the employees in an appropriate unit. Neither § 9 (a) nor § 8 (a)(5), which makes it an unfair labor practice for an employer to refuse to bargain with the representative of his employees, specifies how that representative is to be chosen. The language of the Act thus seems purposefully designed to impose a duty upon an employer to bargain whenever the union representative presents convincing evidence of majority support, regardless of the method by which that support is demonstrated. And both the Board and this Court have in the past consistently interpreted §§ 8 (a) (5) and 9 (a) to mean exactly that. A "union did not have to be certified as the winner of a Board election to invoke a bargaining obligation; it could establish majority status by other means under the unfair labor practice provision of § 8 (a)(5)—by showing convincing support, for instance, by a union-called strike or strike vote, or, as here, by possession of cards signed by a majority of the employees authorizing the union to represent them for collective bargaining purposes." *NLRB* v. *Gissel Packing Co.*, 395 U. S. 575, 597 (footnote omitted).[2]

8 (a)(5), 29 U. S. C. § 158 (a)(5), makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 9 (a)."

[2] For example, in *Mine Workers* v. *Arkansas Flooring Co.*, 351 U. S. 62, 69, the Court stated that where the union had obtained signed authorization cards from a majority of the employees, denial of recognition of the union by the employer would have violated § 8 (a)(5) in the absence of any bona fide dispute as to the existence of the required majority of eligible employees.

As the Court recognized in *Gissel,* the 1947 Taft-Hartley amendments strengthen this interpretation of the Act. One early version of the House bill would have amended the Act to permit the Board to find an employer unfair labor practice for refusing to bargain with a union only if the union was "currently recognized by the employer or certified as such [through an election] under section 9." § 8 (a)(5) of H. R. 3020, 80th Cong., 1st Sess. The proposed change, which would have eliminated any method of requiring employer recognition of a union other than a Board-supervised election, was rejected in conference. H. R. Conf. Rep. No. 510, 80th Cong., 1st Sess., 41. After rejection of the proposed House amendment, the House Conference Report explicitly stated that § 8 (a)(5) was intended to follow the provisions of "existing law." *Ibid.* And "existing law" unequivocally recognized that a union could establish majority status and thereby impose a bargaining obligation on an unwilling employer by means other than petitioning for and winning a Board-supervised election. *NLRB* v. *Gissel Packing Co., supra,* at 596–598.

The 1947 amendments, however, did provide an alternative to immediate union recognition for an employer faced with a union demand to bargain on behalf of his employees. Section 9 (c)(1)(B), added to the Act in 1947, provides that an employer, alleging that one or more individuals or labor organizations have presented a claim to be recognized as the exclusive representative of his employees, may file a petition for a Board-supervised representation election.

This section, together with §§ 8 (a)(5) and 9 (a), provides clear congressional direction as to the proper approach to the situation before us. When an employer is faced with a demand for recognition by a union that has presented convincing evidence of majority support, he may elect to follow one of four alternatives. First,

he is free to recognize the union and thereby satisfy his § 8 (a)(5) obligation to bargain with the representatives "designated or selected" by his employees.[3]   Second, he may petition for a Board-supervised election, pursuant to § 9 (c)(1)(B).   *NLRB* v. *Gissel Packing Co., supra,* at 599.   Third, rather than file his own election petition, the employer can agree to be bound by the results of an expedited consent election ordered after the filing of a union election petition.   See 29 CFR § 102.62.   Finally, the employer can refuse to recognize the union, despite its convincing evidence of majority support, and also refuse either to petition for an election or to consent to a union-requested election.   In this event, however, the Act clearly provides that the union may charge the employer with an unfair labor practice under § 8 (a)(5) for refusing to bargain collectively with the representatives of his employees.   If the General Counsel issues a complaint and the Board determines that the union in fact represents a majority of the employees, the Board must issue an order directing the employer to bargain with the union.   See, *e. g., NLRB* v. *Dahlstrom Metallic Door Co.,* 112 F. 2d 756; cf. *NLRB* v. *Gissel Packing Co., supra,* at 595–600.

The Court offers two justifications for its approval of the new Board practice which, disregarding the clear language of §§ 8 (a)(5) and 9 (a), requires an employer

---

[3] If despite its convincing evidence of majority support the union in fact has not attained majority status, a grant of exclusive recognition to the minority union by the employer would constitute unlawful support in violation of §§ 8 (a)(1) and 8 (a)(2) of the Act. *Garment Workers* v. *NLRB,* 366 U. S. 731, 737–738.   This result, however, imposes no real hardship on the employer or the union since it merely requires that recognition be withheld until a Board-conducted election results in majority selection of a representative. *Id.,* at 739.   In addition, an employer concerned about the possibility of recognizing a minority union may always petition for an election pursuant to § 9 (c)(1)(B) prior to recognition.

to bargain only with a union certified as bargaining representative after a Board-supervised election conducted upon the petition of the union.[4]

First, it is suggested that to require the Board under some circumstances to find a § 8 (a)(5) violation when an employer refuses to bargain with the noncertified union supported by a majority of his employees would compel the Board to re-enter the domain of subjective "good faith" inquiries. *Ante,* at 306. This fear is unwarranted. It is true that early in the administration of the Act it was held that an employer could lawfully refuse to bargain if he had a good-faith doubt as to the union's majority status, even if in fact the union did represent a majority of the employees. See *NLRB* v. *Gissel Packing Co., supra,* at 597 n. 11; *NLRB* v. *Remington Rand, Inc.,* 94 F. 2d 862, 868. But it was recognized at the same time that a union could present "convincing evidence of majority support" that "could not in good faith be ignored." *NLRB* v. *Dahlstrom Metallic Door Co., supra,* at 757; see *NLRB* v. *Gissel Packing Co., supra,* at 596; *NLRB* v. *Remington Rand, Inc., supra,* at 868.

Within broad limits imposed by the Act itself, the Board may use its understanding of the policies and practical considerations of the Act's administration to determine the circumstances under which an employer must take evidence of majority support as "convincing." Cf. *NLRB* v. *Insurance Agents,* 361 U. S. 477, 499; *NLRB* v. *Truck Drivers Union,* 353 U. S. 87, 96. The Act in no way requires the Board to define "convincing evidence" in a manner that reintroduces a subjective

---

[4] The Board, of course, continues to permit an employer voluntarily to recognize a noncertified union supported by a majority of his employees. But under the Board rule approved by the Court, an employer has no obligation to do so under the Act.

test of the employer's good faith in refusing to bargain with the union. If the Board continues to believe, as it has in the recent past, that it is unworkable to adopt any standard for determining when an employer has breached his duty to bargain that incorporates a subjective element, see *NLRB* v. *Gissel Packing Co.*, 395 U. S., at 592–594, it may define "convincing evidence of majority support" solely by reference to objective criteria—for example, by reference to "a union-called strike or strike vote, or, as here, by possession of cards signed by a majority of the employees . . . ." *Id.*, at 597.[5]

Even with adoption of such an objective standard for measuring "convincing evidence of majority support," the employer's "subjective" doubts would be adequately safeguarded by § 9 (c)(1)(B)'s assurance of the right to file his own petition for an election. Despite the Board's broad discretion in this area, however, the Act simply does not permit the Board to adopt a rule that avoids *subjective* inquiries by eliminating entirely *all* inquiries into an employer's obligation to bargain with a noncertified union selected by a majority of his employees.

The second ground upon which the Court justifies its approval of the Board's new practice is that it serves to remove from the employer the burden of obtaining a Board-supervised election. *Ante*, at 307. Although I agree with the Court that it would be improper to impose such an obligation on an employer, the Board's

---

[5] I do not attempt to indicate how the Board should specify standards as to what may constitute "convincing evidence." In view of its experience and expertise, the Board is better qualified than we are to undertake the specifics of this task. I do suggest that the support of a bare majority of employees, whether demonstrated by authorization cards, a strike, or a strike vote, would not necessarily constitute convincing evidence. Given the possibility of undue peer pressure or even coercion in personal card solicitation or nonsecret strike votes, a higher level of objective dependability might be obtained by requiring a greater show of support than a bare majority.

new policy is not necessary to eliminate such a burden.

The only employer obligation relevant to this case, apart from the requirement that the employer not commit independent unfair labor practices that would prejudice the holding of a fair election, is the one imposed by §§ 8 (a)(5) and 9 (a) of the Act: an employer has a duty to bargain collectively with the representative designated or selected by his employees. When an employer is confronted with "convincing evidence of majority support," he has the *option* of petitioning for an election or consenting to an expedited union-petitioned election. As the Court explains, § 9 (c)(1)(B) does not require the employer to exercise this option. If he does not, however, and if he does not voluntarily recognize the union, he must take the risk that his conduct will be found by the Board to constitute a violation of his § 8 (a)(5) duty to bargain. In short, petitioning for an election is not an employer obligation; it is a device created by Congress for the employer's self-protection, much as Congress gave unions the right to petition for elections to establish their majority status but deliberately chose not to require a union to seek an election before it could impose a bargaining obligation on an unwilling employer. *NLRB* v. *Gissel Packing Co., supra,* at 598–599.[6]

---

[6] Although the Court reiterates the generally acknowledged view that elections are the preferred method for determining whether a union has majority support, it suggests that an election held as a result of an employer petition or an expedited election to which the employer has consented is somehow less desirable than a union-requested election. *Ante,* at 309. No such distinction is possible. The advantages of a secret election to determine the true desires of employees with respect to the selection of a collective-bargaining representative, ensuring a choice that is free from the influences of mass psychology, see *Brooks* v. *NLRB,* 348 U. S. 96, 100, are entirely unrelated to whether the union or the employer has initiated the election proceedings.

The language and history of the Act clearly indicate that Congress intended to impose upon an employer the duty to bargain with a union that has presented convincing evidence of majority support, even though the union has not petitioned for and won a Board-supervised election. "It is not necessary for us to justify the policy of Congress. It is enough that we find it in the statute. That policy cannot be defeated by the Board's policy." *Colgate-Palmolive-Peet Co.* v. *NLRB*, 338 U. S. 355, 363. Accordingly, I would affirm the judgment of the Court of Appeals remanding the case to the Board, but for further proceedings consistent with the views expressed in this opinion.