GEORGETOWN HOTEL, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 86–1643.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 8, 1987.

Decided Dec. 29, 1987.

Maurice Baskin, with whom Robert G. Ames, Washington, D.C., was on the brief, for petitioner.

Richard A. Cohen, Atty., N.L.R.B., with whom Howard E. Perlstein, Atty., Rosemary M. Collyer, Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, and Aileen A. Armstrong, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., were on the brief, for respondent. Elliott Moore, Attorney, National Labor Relations Board, Washington, D.C., also entered an appearance for the respondent.

Before EDWARDS, SILBERMAN and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge EDWARDS.

Dissenting Opinion filed by Circuit Judge SILBERMAN.

HARRY T. EDWARDS, Circuit Judge:

This case involves an unfair labor practice charge filed by Local 25 of the Hotel Employees and Restaurant Employees International Union, AFL–CIO ("Union"), with the National Labor Relations Board ("NLRB" or "Board"), alleging that the Georgetown Hotel ("Hotel") violated sections 8(a)(1) and (5) of the National Labor Relations Act ("Act"), 29 U.S.C. § 158(a)(1), (5) (1982), by refusing to bargain with the Union after voluntarily recognizing it as the bargaining representative of the Hotel's housekeeping, housemen, linen and bellmen employees ("housekeeping employees"). Relying on inferences alone, an Ad-

ministrative Law Judge ("ALJ") found that the Hotel had, in fact, voluntarily recognized the Union, and had therefore violated the Act by subsequently refusing to bargain. The ALJ thus issued a recommended order directing the Hotel to bargain with the Union. The Board summarily adopted the ALJ's decision and recommended order.

Because there is no evidence in the record even remotely suggesting that the Hotel recognized the Union, the chain of inferences adopted by the Board is devoid of support. Accordingly, we hereby reverse the decision of the Board and deny its petition to enforce the order to bargain.

## I. BACKGROUND

On Friday, March 12, 1982, four of the Union's agents, led by Ronald Richardson, met with the Hotel's managing director, Jack Rosenbloom, in an attempt to secure Rosenbloom's voluntary recognition of the Union as the bargaining representative of the Hotel's housekeeping employees. Upon entering Rosenbloom's office, Richardson handed Rosenbloom 17 union authorization cards, which Richardson claimed were signed by a majority of the Hotel's housekeeping employees, together with photocopies of each card.[1] Following a request from Richardson, Rosenbloom confirmed that there was a photocopy of each card.[2]

Richardson then asked Rosenbloom to sign a union recognition agreement. Rosenbloom refused. He later explained that he refused to sign the agreement because he "was not familiar with the names of the employees in the housekeeping department, and also there was no way that [he] could confirm or validate the signatures on the cards."[3] Richardson testified that Rosenbloom agreed, nonetheless, to sign the agreement and to commence negotiations when and if he could verify that the names on the cards appeared on the Hotel's payroll records and that they represented a majority of the Hotel's housekeeping employees.[4] Rosenbloom denied making this agreement.[5]

Both sides agree, however, that the March 12 meeting ended with Richardson leaving Rosenbloom the photocopies of the cards and the proposed union recognition agreement. Rosenbloom immediately contacted Peter Chatilovicz, an attorney for the Hotel Association of Washington, D.C. Chatilovicz informed Rosenbloom that he had three options: he could simply do nothing; he could attempt to confirm the Union's alleged majority status; or he could file an election petition with the Board.[6] Chatilovicz advised Rosenbloom to send him the cards and the union recognition agreement as soon as possible, and to take no other action.[7]

On Tuesday, March 16, Chatilovicz and Richardson met for lunch at the Mayflower

---

1. It is undisputed that the Hotel had 30 or 31 housekeeping employees at the time of the March 12 meeting.

2. Each card was titled "Authorization for Representation," and included the following statement: "I desire to be represented by Hotel & Restaurant Employees Local 25, AFL–CIO, and I hereby designate Local 25 as my bargaining agent in matters of wages, hours and other conditions of employment." *Wayside Realty Group, Inc. & Georgetown Hotel,* No. 5–CA–14675, slip op. at 5 (ALJ decision and order Apr. 22, 1983) ("ALJ op."), *reprinted in* Joint Appendix ("J.A.") 11, 15.

3. Transcript of Hearing (Jan. 5, 1983) ("Tr. II") at 306, J.A. 336. Rosenbloom had been working at the Hotel for approximately four weeks at the time of the March 12 meeting. ALJ op. at 10 n. 10, J.A. 20 n. 10.

4. Transcript of Hearing (Jan. 4, 1983) ("Tr. I") at 18, J.A. 66. Richardson also testified that, before he handed Rosenbloom the cards, Rosenbloom agreed to recognize the Union immediately if the cards alone demonstrated that the Union represented a majority of the housekeeping employees. Tr. I at 13–14, J.A. 61–62. The ALJ discredited this testimony, ALJ op. at 10–11, J.A. 20–21, and, more important, the General Counsel does not claim on this appeal that the Union secured recognition from Rosenbloom *during* the March 12 meeting.

5. Tr. II at 307, J.A. 337.

6. Tr. II at 276, J.A. 306.

7. Tr. II at 275, 279, J.A. 305, 309.

Hotel.[8] Richardson later testified that, after he described the March 12 meeting, Chatilovicz made the following remark: "I know that you've been through this, and that you've done it already, and Mr. Rosenbloom reached an agreement, but we would like very much to have [a Board] election." [9] According to the Board's General Counsel, "Richardson's initial response [to Chatilovicz' proposal] was that he was not concerned with Rosenbloom's problem and that the Union would file charges with the Board and picket if the Hotel fired Rosenbloom and tried to renege on the agreement." [10] Nonetheless, Richardson suggested that a private, non-Board election be conducted.[11]

Chatilovicz relayed this suggestion to Rosenbloom, who, after consulting with officials from Wayside Realty Group, Inc. ("Wayside"), the Hotel's corporate owner, agreed to a private election. The arrangements for a March 24 election were set forth in a letter from Chatilovicz to Richardson dated March 23.[12] The letter contained a list of 31 employees who were eligible to vote in the election, and the following statement:

> It is agreed that if Local 25 wins the election the Hotel will recognize the Union as the exclusive bargaining representative for the above employees. If the Hotel should win the election, Local 25 agrees that it shall be barred from petitioning for an election or seeking recognition by any other means for a period of six months.[13]

It is undisputed that Richardson agreed to these terms.

Later that day, however, the Hotel retained new counsel who advised that the election be cancelled. The Hotel then informed the Union that it would not proceed with the election, thus prompting the Union to file the unfair labor practice charge with the Board that forms the basis of this case.

Following the issuance of a complaint by the Board's General Counsel, a hearing was held before an ALJ on January 4 and 5, 1983. In a decision rendered on April 22, 1983, the ALJ first rejected the Union's claim that Rosenbloom agreed to recognize the Union at the March 12 meeting after inspecting the authorization cards proffered by Richardson: "it can hardly be argued that assenting to check the cards amounts to assenting to recognize the Union." [14]

The ALJ did find, however, "that Rosenbloom agreed to recognize the Union *upon his verification* that the names on the signed cards also appeared on [the Hotel's] payroll records and represented a majority of employees on [the] payroll records." [15] Thus, the critical question was whether the Hotel ever fulfilled this conditional agreement by *actually* checking the cards against the Hotel's payroll records. In answering this question in the affirmative, the ALJ could not cite any direct evidence that Rosenbloom, or anyone else for that matter, actually checked the cards. Instead, the ALJ relied on the following reasoning:

> [T]he condition for Rosenbloom's recognition of the Union (verification that 17 signed cards represented legitimate employees and a majority of employees) was

**8.** Chatilovicz and Richardson had previously scheduled this luncheon meeting in order to discuss matters unrelated to this litigation. Both sides agree that the ALJ incorrectly stated that this meeting took place on March 13.

**9.** Tr. I at 22, J.A. 70; *see also* ALJ op. at 13, J.A. 23.

**10.** Brief for the Board at 11.

**11.** *Id.* at 11–12, 19; *see also* Tr. I at 23, J.A. 71; ALJ op. at 13, J.A. 23.

**12.** Letter from Peter Chatilovicz to Ronald Richardson (Mar. 23, 1982), *reprinted in* J.A. 371.

**13.** *Id.* at 372.

**14.** ALJ op. at 11, J.A. 21. The ALJ thereby rejected the General Counsel's original theory, set forth in subparagraphs 5(b) and (c) of its complaint, that recognition occurred during the March 12 meeting. *See* Complaint and Notice of Hearing, *reprinted in* J.A. 4, 5. As noted above, *see* note 4 *supra*, the General Counsel no longer pursues this theory of recognition.

**15.** ALJ op. at 11, J.A. 21 (emphasis added). In making this finding, the ALJ discredited Rosenbloom's testimony that he never made this agreement. ALJ op. at 11 n. 11, J.A. 21 n. 11.

met and satisfied, as evidenced by the oral agreement reached by Richardson and Chatilovicz on March 13 or 15, and thereafter reduced to writing in a letter signed and dated March 23. The letter shows that [the Hotel] had 30 employees in its employ on March 12, ... and that 17 of the names on the signed cards appear in the letter's list of 30 eligible voters. *It may be reasonably inferred from this agreement that [the Hotel] checked the names on the signed cards with names on its payroll records, and found that they were not only valid but represented a majority of its 30 or 31 employees....*

Consequently, I conclude and find that [the Hotel], through its first-retained legal counsel and agent (Mr. Chatilovicz) acknowledged in oral conversations with Richardson on March 13 or 15, and in its letter to the Union of March 23, that the Union actually possessed signed cards from a majority of [the Hotel's] employees on March 12. Such acknowledgement was the verifying condition upon which Manager Rosenbloom agreed to recognize the Union....[16]

After finding that the Hotel had voluntarily recognized the Union as the representative of the housekeeping employees, the ALJ concluded that the Hotel had violated the Act by refusing to bargain with the Union. Consequently, the ALJ recommended that the Hotel be ordered to bargain with the Union.

The Hotel and Wayside filed timely exceptions with the Board. Over three years later, on September 9, 1986, the Board summarily affirmed the ALJ's decision and adopted his recommended order. *Wayside Realty Group, Inc. & Georgetown Hotel*, 281 N.L.R.B. No. 45 (Sept. 9, 1986) ("Board op."), *reprinted in* J.A. 32.[17] In a one-

paragraph footnote, the Board stated that the Hotel agreed on March 12 "to recognize the Union upon its verification that the card signers were on its payroll."[18] Furthermore, the Board described the aborted private election as a "nullity [which] left the [Hotel] with the obligation, according to its earlier agreement, to voluntarily recognize and bargain with the Union on the basis of a card majority."[19] The Board did not find that the card check was actually performed.

The Hotel filed a petition for review of the Board's decision and order with this court on November 28, 1986. The Board cross-appealed for enforcement of its order against both the Hotel and Wayside.[20] It is undisputed that this court has jurisdiction under sections 10(e) and (f) of the Act. 29 U.S.C. § 160(e), (f) (1982).

## II. ANALYSIS

■ The law regarding voluntary recognition is straightforward. In *Linden Lumber Division v. NLRB*, 419 U.S. 301, 95 S.Ct. 429, 42 L.Ed.2d 465 (1974), the Supreme Court held that an employer does not commit an unfair labor practice by refusing to accept evidence of majority status proffered by a union through some means other than a Board election. Thus, when confronted with a request for recognition based upon a check of authorization cards, an employer has the right to refuse and insist that the union seek a Board election.

In a line of cases stretching back to *Snow & Sons*, 134 N.L.R.B. 709 (1961), *enforced*, 308 F.2d 687 (9th Cir.1962), however, voluntary recognition has been found to have occurred when an employer agrees to recognize a union through a card check

---

**16.** ALJ op. at 15, J.A. 25 (emphasis added) (parentheticals in original) (citations omitted).

**17.** The ALJ's decision and order is appended to the Board's opinion. In an unpublished order dated November 20, 1986, the Board denied the Hotel and Wayside's motion for reconsideration. *See* Order Denying Motion, *reprinted in* J.A. 47.

**18.** Board op. at 2 n. 3, J.A. 33 n. 3.

**19.** *Id.*

**20.** Because Wayside sold its entire interest in the Hotel on February 14, 1985, it did not petition for review. But, in light of the Board's petition to enforce its order against Wayside as well as the Hotel, Wayside has entered an appearance in this proceeding. *See* Brief of Petitioner and Cross–Respondents at 1 n. 3.

or some other procedure *and* subsequently confirms the union's majority status through that procedure. Thus, the Board has held that an employer may commit an unfair labor practice if it corroborates a union's majority status pursuant to an agreed-upon procedure, and then reneges on its promise of recognition. While these cases are fact-specific, there is a common thread—in each case the Board has found abundant evidence that the union's majority status was in fact *verified* according to the agreed-upon procedure. In *Cam Industries, Inc.*, 251 N.L.R.B. 11 (1980), *enforced*, 666 F.2d 411 (9th Cir.1982), for example, the employer signed an agreement in which it promised to grant recognition after an official from the state conciliation service checked the authorization cards furnished by a union and determined that they represented a majority of the employees in the unit at issue. A state conciliator then compared the cards with the employer's payroll records and W–2 forms. *See also Without Reservation*, 280 N.L.R.B. No. 165 (July 31, 1986) (clergyman checked cards).[21]

■ By contrast, in the instant case, neither the ALJ nor the Board found any evidence that Rosenbloom or his agent, Chatilovicz, actually verified the Union's majority status according to the agreed-upon procedure—a comparison of the 17 authorization cards with the Hotel's payroll records. Indeed, the General Counsel conceded at oral argument that *there is not*

one iota of evidence in the record that suggests otherwise. Yet, the ALJ (and the Board by adopting the ALJ's findings) somehow *inferred* that a card check was performed from the mere fact that Chatilovicz and Richardson orally agreed to a private election, and then memorialized this agreement in the March 23 letter.[22] This finding is quite extraordinary, because it totally defies both logic and common sense.

This court is obligated to affirm the decision below if it is supported by substantial evidence in the record considered as a whole. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951); *NLRB v. Gateway Theatre Corp.*, 818 F.2d 971, 974 (D.C.Cir. 1987). However, in this case, because we are unable to find a shred of evidence to support the Board's rationale, we have no choice but to reverse the decision under review. It simply does *not* follow that, because the Hotel agreed to a private election and created an employee list, Rosenbloom or Chatilovicz had checked the authorization cards. Moreover, it defies common sense to argue that Rosenbloom or Chatilovicz could not have prepared the eligibility list without first checking the names on the cards.[23] Thus, unlike *Cam Industries, Inc.* and *Without Reservation*, in this case the Board is unable to point to any evidence in the record to suggest that verification, the critical prerequisite to recognition, ever occurred.[24]

21. Likewise, in cases involving immediate unconditional recognition, there often is no serious dispute whether the employer recognized the union. *See, e.g., Jeer–Dan Corp.*, 237 N.L.R. B. 302, 302 (1978), *enforced*, 601 F.2d 575 (3d Cir.1979) (employer looked at authorization cards and said "you got them all," and agreed to meet for the express purpose of engaging in collective bargaining).

22. The General Counsel does not contend in its brief to this court that there is any direct evidence in the record to support the ALJ's finding. Instead, the General Counsel argues that the ALJ correctly concluded that "Chatilovicz ... *implicitly* confirmed in a series of ... communications that the Union's majority status had been verified by the Hotel through the agreed-upon procedure." Brief for the Board at 19 (emphasis added).

23. As the Hotel points out in its brief: "Chatilovicz could have and in fact did obtain these names from the Hotel's payroll records without any need to look at the signatures on the cards themselves." Brief of Petitioner and Cross–Respondents at 10.

24. To the extent that the ALJ relied on Chatilovicz' statement to Richardson at the March 16 lunch that Richardson and Rosenbloom had "reached an agreement" on March 12, this reliance is misplaced. This statement only reiterates that recognition was predicated on a card check. Indeed, in discrediting that part of Chatilovicz' testimony in which he denied making this statement, the ALJ noted that the "agreement" was conditional. ALJ op. at 13 n. 12, J.A. 23 n. 12.

To support the ALJ's conclusion, one would have to believe that "human nature" instinctively led Rosenbloom or Chatilovicz to check the cards against the payroll list. This view is untenable; indeed, the facts of this case suggest just the opposite, since Chatilovicz' immediate reaction was to instruct Rosenbloom that he should *not* check the cards. Moreover, a "human nature" approach would result in a rigid rule whereby in any case in which an employer receives cards from a union, it must *always* be assumed that the employer will attempt to verify that the names on the cards are legitimate and represent a majority of the employees in an appropriate unit. To our knowledge, the Board has never enunciated such a rule to guide its judgments in cases of this sort, and the General Counsel has not explained why this court *sua sponte* should adopt this proposition. *See Darr v. NLRB,* 801 F.2d 1404, 1408–09 (D.C.Cir. 1986) (Board must articulate a theory to justify its decision).

■ If we focus on the credited evidence in this record, we are left with a simple situation in which Rosenbloom reneged on his promise to verify that the names on the cards represented a majority of the housekeeping employees. The Board's only relevant precedent, *United Buckingham Freight Lines,* 168 N.L.R.B. 684 (1967), directly supports the Hotel's position that an employer is free to repudiate a voluntarily agreed-upon verification procedure and to insist on a Board election, so long as the employer makes this choice *prior* to actually verifying the Union's majority status.[25] The General Counsel has not offered any arguments for why a different rule should apply in this case. *See Oil, Chemical & Atomic Workers Int'l Union v. NLRB,* 806 F.2d 269, 273–75 (D.C.Cir.1986) (enforcement of orders denied due to Board's unexplained departure from precedent).[26]

In short, the Union in this case had nothing more than signed cards from a majority of the housekeeping employees. That alone was not enough to achieve bargaining status, absent recognition by the Hotel. *See Linden Lumber Division, supra.* But, as the Board found, the Hotel management gave only a *conditional* promise to recognize the Union *if* Rosenbloom personally verified that the names on the cards appeared on the Hotel's payroll records and represented a majority of the housekeeping employees. When Rosenbloom subsequently declined to seek this verification, the condition could not be met and recognition could not be achieved without an election. *See id.; United Buckingham Freight Lines, supra.* Since the Hotel lawfully declined to recognize the Union and did not otherwise violate the Act, the Board had no basis upon which to find a refusal to bargain.

## III. CONCLUSION

For the reasons stated above, we grant the Hotel's petition for review and deny the Board's petition to enforce. The decision of the Board is hereby reversed.

*So ordered.*

SILBERMAN, Circuit Judge, dissenting:

This case, which involves an unusual set of facts, presents a very narrow question of substantive labor law but, it seems to me, a much more important issue as to the appropriate scope of judicial review.

It is perfectly true, as the majority emphasizes, that an employer is not obliged to accept and validate a union's proffered authorization cards to determine whether they constitute evidence of majority status. *Linden Lumber Division v. NLRB,* 419 U.S. 301, 95 S.Ct. 429, 42 L.Ed.2d 465 (1974). It has, instead, every right to insist on an election. *Id.* On the other hand, if an employer does agree to recognize a union, subject to a card check, and subsequently satisfies that condition, it has bound itself to recognize the union al-

---

**25.** The Supreme Court explicitly reserved judgment on this issue in *Linden Lumber Division,* 419 U.S. at 310 n. 10, 95 S.Ct. at 434 n. 10.

**26.** In fact, the General Counsel claims at two points in its brief that the issues raised in *United Buckingham Freight Lines* are "not presented here." Brief for the Board at 17 n. 5, 23 n. 9.

though the employer, at least under present Board law, may withdraw from the agreement at any time prior to its execution. *United Buckingham Freight Lines,* 168 N.L.R.B. 684 (1967). Here, as found by the Administrative Law Judge ("ALJ") and the Board, the employer's expressed condition subsequent was more limited than the normal validation of cards; he asked not to determine whether the employees voluntarily and knowingly signed the union authorization cards or whether the signatures were genuine, *cf. Harding Glass Indus.,* 216 N.L.R.B. 331 (1975), but rather, as a new manager, only to determine whether the signatories were employees on his hotel's payroll (and not floater employees actually on the payroll of two other nearby affiliated hotels), and if so, whether they were a majority. The ALJ concluded as a finding of fact (adopted by the Board) [1] that the employer had satisfied the condition—that it had "checked the names on the signed cards with names on its payroll records." ALJ op. at 15, J.A. 25. It is that finding of fact that the majority concludes is unsupported by substantial evidence and therefore declines to accept.

The finding rests, as the ALJ explicitly stated, not on any direct testimony that the employer had compared the cards with the payroll list, but rather on inferences the ALJ drew from the employer's subsequent conduct. Specifically, the ALJ inferred that when the employer's counsel sent the Union representative (preparatory to the private election arranged to save the manager, Rosenbloom, embarrassment) the very payroll list against which the manager had agreed to compare the names on the cards, either the manager or his counsel had compared the one to the other.[2] Of course, it is possible that neither the attorney nor the manager compared the two. The majority emphasizes that counsel testi-

fied he *advised* the manager not to check the cards. Majority op. at 1472. If Chatilovicz had testified to that effect, the ALJ, of course, was not obliged to credit his testimony.[3] But Chatilovicz did *not* so testify. Instead, Chatilovicz said that he told "Mr. Rosenbloom that he could simply ignore the visit and do nothing. I said he could take a look at the cards further and try to determine through a payroll list or some other method to see if the employees did represent a majority...." J.A. 306. Later on, when asked whether Rosenbloom "at any time indicate[d] he was going to do that, check his records," Chatilovicz responded "No, to the contrary. I had advised him to put the cards in an envelope and to send them over to me." J.A. 309. Chatilovicz never said he advised Rosenbloom not to look at the cards, and he never said that Rosenbloom denied looking at the cards. Moreover, Chatilovicz never denied having checked the cards himself. Nor did Rosenbloom testify that he was advised not to check the cards, or that he did not do so. What is more, one of the two options Chatilovicz suggested to Rosenbloom was to check the cards against the payroll. This is exactly what the ALJ found was done. What the majority does is even more problematic than relying on non-credited testimony—it relies on testimony that, as far as I can determine, is not in the record.

The Board's inference that the employer compared the cards to a payroll list is further strengthened because once a quick informal private election was agreed upon in lieu of the payroll check, there was no longer any disincentive to examine the payroll list; so long as the private election agreement was in force that comparison had no legal consequences. It was only after the employer discharged Chatilovicz, retained other counsel, and disavowed the

---

1. The Board adopted the ALJ's findings and conclusions. The footnote authored by two Board members did *not,* as the majority suggests, majority op. at 1470, reject the ALJ's finding that the names were actually checked against the payroll list. Board op. at 2 n. 3, J.A. 33.

2. At oral argument, counsel for the Board said nothing inconsistent with this. *But cf.* majority op. at 1471.

3. Indeed, the ALJ specifically declined to credit other important portions of Chatilovicz' testimony. ALJ op. at 13, J.A. 23.

private election agreement that—as the Board held, Board op. at 2 n. 3, J.A. 33—the prior existing agreement was resuscitated. And at that point the prior agreement had, by virtue of the preparations for the private election, been completely executed. The ALJ thought that since Rosenbloom's only condition upon recognition was mere assurance, by examination of the payroll, that the employees who signed the cards were employed by the hotel, it was reasonable to infer that the very preparation of the payroll list to be sent to the union more likely than not satisfied the condition—that the manager or his counsel had at one point looked at both the cards and the list.

Surely if, after the original meeting between Richardson and Rosenbloom, the latter had merely sent the payroll list to Richardson, and no other evidence one way or the other indicated whether Rosenbloom had compared the list against the cards, a finding that Rosenbloom had in fact compared the two would be unassailable. I think this case is not significantly different. The agreement to a private election is relevant only because it created the circumstances whereby the payroll list was compiled and transmitted.

The majority, it seems to me, asks much too much when it demands that the circumstantial evidence upon which the ALJ relies must necessarily establish the fact found. Administrative agencies are entitled to find facts based on inferences drawn from circumstantial evidence that are not, as a matter of human experience, inevitable. Determination of what turned out to be the critical fact in this case—whether or not Rosenbloom or Chatilovicz compared the payroll list to the names on the cards—in the absence of direct testimony must rest on inferences "and it has long been settled that an agency's conclusions based upon such inferences should not be set aside by a reviewing court unless they transgress the bounds of reason." *Catholic Medical Center v. NLRB*, 620 F.2d 20, 22 (2d Cir. 1980). Indeed, this seems precisely the point at which an agency's expertise is most useful and should be most respected by a reviewing court. For "it is the Board to which Congress has delegated administration of the Act. The Board, therefore, is viewed as particularly capable of drawing inferences from the facts of a labor dispute. Accordingly, it has been said that a Court of Appeals must abide by the Board's derivative inferences ... unless those inferences are 'irrational,' 'tenuous' or 'unwarranted.'" *Penasquitos Village, Inc. v. NLRB*, 565 F.2d 1074, 1079 (9th Cir.1977) (citations omitted).

The majority, by relying on "common sense," majority op. at 1471–72, to reject the inference drawn by the ALJ is either crediting a version of Chatilovicz' and Rosenbloom's testimony that neither actually advanced or it is preferring its own expertise to that of the Board: I do not believe either is permissible. It is true, as the majority points out, that Rosenbloom or Chatilovicz *could* have prepared the eligibility list without checking the names on the cards. *Id.* at 1472. But it is also reasonable to infer, as did the ALJ and the Board, that they *did* check the names; this finding is hardly "irrational." "[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966); *Public Citizen Health Research Group v. Tyson*, 796 F.2d 1479, 1485 (D.C.Cir.1986). Our role as a reviewing court is not to decide which of the two possible conclusions we would choose, but whether the Board's choice is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 488, 71 S.Ct. 456, 459, 464, 95 L.Ed. 456 (1951); *American Federation of Labor v. Marshall*, 617 F.2d 636, 649 n. 44 (D.C.Cir.1979). If this standard is applied, then the Board's ruling must stand.

It is illustrative to consider whether if we were reviewing a jury verdict in favor of the Board, rather than an agency determination, we would grant a judgment n.o.v. For substantial evidence has been defined

as "enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." *Consolo v. Federal Maritime Comm'n*, 383 U.S. at 620, 86 S.Ct. at 1026. It is clear that "a verdict based on circumstantial evidence is not infirm simply because the evidence supports an equally probable inference to the contrary. It is the jury that chooses among allowable inferences. The standard for determining whether an inference is allowable is ... whether it is one that 'reasonable and fair-minded men in the exercise of impartial judgment' might draw from the evidence. An inference is not unreasonable simply because it is based in part on conjecture, for an inference by definition is at least partially conjectural." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1326 (11th Cir.1982) (citation omitted). *See Williams v. Steuart Motor Co.*, 494 F.2d 1074, 1082 (D.C.Cir.1974). I think it obvious that on these facts we would not grant judgment n.o.v. to the petitioner and yet the majority does not hesitate to reverse the *expert* finding of the agency.

To be sure we are not here faced—as we often are—with a highly technical or scientific finding of an administrative agency to which deference seems more natural. This case involves only an unusual twist on a familiar, easily understandable event. But it is no less objectionable, in my view, for the court to prefer its judgment as to the weight of the circumstantial evidence to that of the Board's than it would be if the question were more complex or unfamiliar. Restrictions on judicial review of agency fact findings—like limitations on review of jury verdicts—are based not just on notions of relative institutional competence, but rather on our understanding of the federal judiciary's appropriately limited role.

Nor do I agree with the majority that affirming the ALJ and the Board's finding would result in the "rigid rule" the majority fears—that whenever an employer accepts cards from a union, verification will be assumed. Majority op. at 1472. An employer has an absolute right to reject authorization cards and to seek a Board election. Even when an employer accepts cards subject to verification that normally refers to a good deal more than the limited inquiry this employer imposed as a condition subsequent to the recognition agreement, and therefore a finding that verification had taken place would usually be more difficult. *See, e.g., Cam Indus.*, 251 N.L.R.B. 11 (1980), *enforced*, 666 F.2d 411 (9th Cir.1982); *Harding Glass Indus.*, 216 N.L.R.B. 331 (1975). The majority takes the Board to task for not explaining why this court should adopt the "rigid rule" it claims has been adopted here. But it seems to me this finding of fact did not a rigid rule make, and the Board has not characterized its decision as the adoption of a rule of any sort. It is inappropriate to require an explanation for that which has not been done.

In sum, this is, as I said at the outset, an unusual case but since I believe the majority's scope of review to be outside the bounds of the National Labor Relations Act, I respectfully dissent.