PENNSYLVANIA STATE EDUCATION
ASSOCIATION–NEA, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

Nos. 95–1112, 95–1124.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 23, 1996.

Decided March 15, 1996.

Robert G. Haas, Harrisburg, argued the cause and filed the briefs for petitioner Polyclinic Medical Center of Harrisburg. William A. Chesnutt entered an appearance.

Jonathan Walters, Philadelphia, argued the cause and filed the briefs for petitioner Pennsylvania State Education Association–NEA.

Joseph A. Oertel, National Labor Relations Board, Washington, DC, argued the cause for respondent, with whom Linda R. Sher, Associate General Counsel, and Aileen A. Armstrong, Deputy Associate General Counsel, were on the brief. William M. Bernstein, Attorney, entered an appearance.

Before: WALD, WILLIAMS and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

The National Labor Relations Board ("NLRB" or "Board") ruled that petitioners unlawfully engaged in a variety of unfair labor practices. We conclude that the Board's ruling is supported by substantial evidence, and therefore deny the petitions for review and grant the NLRB's cross-petition for enforcement. Petitioner Polyclinic Medical Center ("Polyclinic"), an employer, withdrew recognition from a union which it had previously recognized, and which under the law enjoyed a presumption that it was supported by a majority of unit employees. Polyclinic and petitioner Pennsylvania State Education Association–NEA ("PSEA") then entered into a bargaining agreement without evidence that PSEA had the support of a majority of the employees. Further, that agreement provided that members of PSEA could not resign their membership while the agreement remained in force. Each act violated the National Labor Relations Act ("NLRA").

## I. BACKGROUND

In large part, this case involves the meaning and effect of the "authorization cards" that PSEA collected from the registered and licensed practical nurses employed by Polyclinic, who together constitute the relevant "bargaining unit." Because authorization cards may serve different functions at the various stages of a union membership drive, we begin by setting forth a general discussion of the union-recognition process.

### A. The Process of Union Recognition

■■■ The heart of a union's membership drive is its effort to persuade a majority of unit employees to support it, usually by collecting employees' signatures on authorization cards indicating that they wish to designate the union as their collective-bargaining representative.[1] What the union may do after collecting the cards depends on the degree of support it received. If fewer than

---

1. Under Board precedent, authorization cards are not the only means by which a union may establish its majority support. *See, e.g.,* JOHN D. FERRICK ET AL., NLRB REPRESENTATION ELECTIONS § 3.1, at 73–74 (1985) (identifying employee petitions and employer polls as alternative means); 4 THEODORE KHEEL, LABOR LAW § 15–01, at 15–2 (1995) (identifying strikes, strike votes, and employer's independent knowledge).

30% of the unit employees signed such cards, the union generally cannot move any closer toward achieving representative status. If, on the other hand, more than 50% of the unit employees signed such cards, the union may ask the employer voluntarily to recognize it as the employees' collective-bargaining representative. The employer, however, may decline that invitation, *Linden Lumber Division v. NLRB*, 419 U.S. 301, 309–10, 95 S.Ct. 429, 433–34, 42 L.Ed.2d 465 (1974), and frequently does so, *see* STEVEN SCHLOSSBERG & JUDITH A. SCOTT, ORGANIZING AND THE LAW 162 (3rd ed. 1983). The union m. ʃ then request that the NLRB conduct a representation election. *See* 29 U.S.C. § 159(c). It may also request an election in the first instance so long as it collected cards from 30% of unit employees. *See* NLRB RULES AND REGULATIONS AND STATEMENTS OF PROCEDURES § 101.18.

■ If the union prevails in the election, *i.e.*, wins out over both competing unions and the choice of no union at all, it becomes the employees' collective-bargaining representative.[2] An employer's negotiations with a properly designated union generally lead to the adoption of a "collective-bargaining agreement." When the collective-bargaining agreement expires, the incumbent union retains a presumption of majority status. *NLRB v. Creative Food Design Ltd.*, 852 F.2d 1295, 1300 (D.C.Cir.1988). And, of course, it remains an unfair labor practice under the NLRA for an employer to withdraw recognition from a majority union, *see* 29 U.S.C. § 158(a)(5), (1), or to recognize a minority union, *see id.* § 158(a)(2), (1); *International Ladies' Garment Workers' Union v. NLRB*, 366 U.S. 731, 737–38, 81 S.Ct. 1603, 1607, 6 L.Ed.2d 762 (1961), even when the collective-bargaining agreement has expired.

**2.** Even if the union loses, the NLRB may require the employer to bargain with the union if: (1) the union had majority support before the election; and (2) the employer engaged in unfair labor practices that had "the tendency to undermine majority strength and impede the election processes." *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 614, 89 S.Ct. 1918, 1940, 23 L.Ed.2d 547 (1969). *See generally Conair Corp. v. NLRB*, 721 F.2d 1355 (D.C.Cir.1983), *cert. denied*, 467 U.S. 1241, 104 S.Ct. 3511, 82 L.Ed.2d 819 (1984). Where the employer's conduct is less pervasive

### B. *The Use of Authorization Cards*

■ In reviewing bargaining disputes, the NLRB and courts have identified four separate types of authorization cards. Most common are "pure" cards,[3] through which the employee designates a particular union as her collective-bargaining representative; they include an express, affirmative representation "on [their] face that the signer authorizes the Union to represent the employee for bargaining purposes." *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 584, 89 S.Ct. 1918, 1924, 23 L.Ed.2d 547 (1969); *see, e.g., Research Federal Credit Union*, 310 N.L.R.B. 56, 64, 142 L.R.R.M. (BNA) 1250, 1993 WL 7637 (1993) ("REPRESENTATION AND AUTHORIZATION; I hereby designate and authorize the [Union] to represent me for the purpose of collective bargaining."). As discussed *supra*, a union may utilize such cards to achieve representative status through either voluntary recognition or an election.

■ Functionally identical to "pure" cards are "dual purpose" cards; both may be utilized by a union to request voluntary recognition and to call for an election. The only difference between the two is that "dual purpose" cards expressly set forth the possibility of an election, while "pure" cards leave the point implicit. That distinction was set out in *NLRB v. Anchorage Times Publishing Co.*, which reviewed an example of each:

[Pure Card] AUTHORIZATION FOR REPRESENTATION

I authorize the International Brotherhood of Electrical Workers to represent me in collective bargaining with my employer.

[Dual Purpose Card] I REQUEST A GOVERNMENT ELECTION

or disruptive, the Board may call a new election. *Id.*

**3.** These cards have been referred to by a variety of other names as well, including "single purpose" cards. *E.g., Road Sprinkler Fitters Local Union No. 669 v. NLRB*, 681 F.2d 11, 22 (D.C.Cir.1982), *cert. denied*, 459 U.S. 1178, 103 S.Ct. 831, 74 L.Ed.2d 1025 (1983). We utilize a different term because, as shall be seen momentarily, such cards inherently have a dual purpose.

I, the undersigned of my own free will, hereby authorize and designate the National Brotherhood of Electrical Workers of the AFL–CIO and CLC to represent me in collective bargaining with my employer in all matters pertaining to rates of pay, hours of employment, and other conditions of employment. This card is also for the purpose of requesting the N.L.R.B. for an election.

637 F.2d 1359, 1362 n. 2 (9th Cir.), *cert. denied,* 454 U.S. 835, 102 S.Ct. 137, 70 L.Ed.2d 115 (1981); *see also id.* at 1368 ("Both cards clearly and unambiguously indicate the signer's intent to be represented by the Union in collective bargaining.").

■■■■■ Not all cards, however, authorize a union to pursue representative status through both voluntary recognition and an NLRB-supervised election. The wording of the card itself may limit the purpose for which it may be used. Specifically, "single purpose election" cards indicate support for the union, but only expressly call for an election, and do not carry any general designation of the union as the signers' collective-bargaining representative. The affirmative representation on the cards' face typically says that the signer "authorize[s] the union to petition or request an NLRB election."

■■■■■ Finally, some cards have been identified as "ambiguous." Like a "dual purpose" card, an "ambiguous" card includes language that identifies *both* the employee's support for an election and her general designation of the union as her collective-bargaining representative. But such cards, by reason of either design or content, fail to represent clearly that the employee supports both eventualities. Specifically, this circuit deems cards to be "ambiguous," rather than "dual purpose," if they do not "clearly indicate[ ] on their face" the employee's desire to designate the union as her bargaining representative. *Amalgamated Clothing Workers v. NLRB,* 420 F.2d 1296, 1301–02 (D.C.Cir. 1969); *see also International Union, United Auto., Aero., & Ag. Implement Workers of Am. v. NLRB,* 363 F.2d 702, 705 (D.C.Cir.) ("To be sure, the fine print at the bottom of the card says that it is for use in support of a demand for recognition, 'or for an NLRB

election.' But we agree with the Board that notwithstanding the fine print the overall purpose of the card is clear."), *cert. denied,* 385 U.S. 973, 87 S.Ct. 510, 17 L.Ed.2d 436 (1966). In the *Amalgamated Clothing* case, for example, we concluded that the union's authorization cards were ambiguous because they set forth the employee's designation of the union as her collective-bargaining representative and her support for an election on opposite sides of the card. *Accord NLRB v. Shelby Mfg. Co.,* 390 F.2d 595, 596 (6th Cir. 1968).

■■■■■ In the case of "ambiguous" cards, we have allowed parol evidence about what was communicated to the employee to supplement the language on the card in order to ascertain what the employees intended by their signatures. "Ambiguous" cards may be utilized to establish the union's majority support only if there is proof that the signing employees were told by the union that the cards could be used to establish the union's majority status even without an election. *Nissan Research & Development,* 296 N.L.R.B. 598, 599, 132 L.R.R.M. (BNA) 1169, 1989 WL 224319 (1989). If "the card [is] not clear on its face as to its purpose, the 'union must face the possibility that the effectiveness of the cards may be undercut by parol testimony showing that the purpose presented to the employees was that of securing an election and that the purpose of union authorization was not mentioned.'" *Amalgamated Clothing,* 420 F.2d at 1302 (citation omitted); *see also Amalgamated Clothing Workers of Am. v. NLRB,* 365 F.2d 898, 907 (D.C.Cir. 1966) ("When an authorization card itself is unclear about its purpose and no reason is given an employee for signing other than that 'this card is to be used to obtain an election,' the fair inference is that the only reason the employee is signing is to obtain an election. In such circumstances the card itself has so little thrust as signaling an authorization intention, that its effectiveness for that purpose is undercut even though the union representatives did not say in so many words that its 'only' purpose was to secure an election.").

With that background, we turn to the facts of this case.

### C. *Factual Background*

Polyclinic Medical Center of Harrisburg is a provider of medical services. Since the early 1970s, Pennsylvania Nurses Association ("PNA") has been the representative of a bargaining unit consisting of Polyclinic's registered and licensed practical nurses, now numbering approximately 600. The most recent Polyclinic–PNA bargaining agreement ran from July 1, 1990 to June 30, 1993. Almost immediately after that agreement expired, Polyclinic entered into a representation agreement with a different union, Pennsylvania State Education Association–NEA ("PSEA"). Polyclinic's decision to withdraw recognition from PNA, and enter into a new agreement with PSEA, gave rise to the charges in this case.

Between May 28 and June 25, 1993, representatives of Polyclinic and PNA met seven times in an attempt to negotiate an extension to their soon-to-expire collective-bargaining agreement. They failed, however, to come to an agreement before the June 30 contract termination date. An eighth meeting was scheduled for July 1. When Polyclinic's attorney and chief negotiator, Norman White, arrived at the meeting place shortly after 10:00 a.m. on July 1, however, he noticed that the meeting-room signboard bore the name "PPNA," rather than "PNA." White inquired about the discrepancy, and two individuals whom he knew as members of the PNA bargaining team told him that they had formed a new organization entitled Polyclinic Professional Nurses Association ("PPNA"). They also stated that PPNA's chief spokesperson was Debra Ferguson, who had served as PNA's labor representative in the prior bargaining sessions.

Still in the hotel lobby, White was then approached by Alfred Nelson, the Director of Organization and Media Relations for PSEA. Nelson showed White a stack of cards, which he represented as having been signed by a majority of Polyclinic's unit employees. White declined to review the entire stack, but did examine a single card. Its format was as follows:

---

**THE PENNSYLVANIA STATE EDUCATION–NEA**
**Collective Negotiations Authorization Card**

Name:_____

Position:_____

Date:_____

As an employee of the _____
I hereby designate and authorize the _____
PENNSYLVANIA STATE EDUCATION ASSOCIATION NEA, its agents or representatives to petition for a bargaining agent election.

Signature_____

---

During the previous weeks, the cards had been distributed to unit members by Nelson, the PNA rank-and-file bargaining committee, and other individuals. Nelson's "best guess" is that he personally solicited between 50 and 100 nurses to sign cards. Nelson also distributed cards to bargaining-committee members, and instructed them to tell nurses that the cards had two purposes: (1) to seek an NLRB-supervised election; and (2) to request that Polyclinic voluntarily recognize PSEA as the unit's bargaining representative.

In his conversation with White at the hotel on July 1, Nelson explained that the cards were for "dual purpose recognition." Nelson therefore requested that Polyclinic recognize PSEA as the nurses' bargaining agent. White in turn requested that Nelson have a neutral third party check the cards against a list of unit employees. Nelson agreed to do

so, and White arranged to make Polyclinic's payroll list available for that purpose. Later that afternoon, a representative of the Pennsylvania Labor Relations Board, Dr. Arnold Hillman, checked the PSEA cards against Polyclinic's payroll list; of 582 unit employees, he concluded that 339, a majority, had signed on.

After speaking with Nelson in the lobby, White traveled to a meeting room, where he spoke briefly with PNA's Director of Labor Relations, Michael Kirkpatrick. This was the first time the two had met; the earlier Polyclinic–PNA negotiation sessions had generally been led by White and Debra Ferguson. Kirkpatrick informed White that PNA had fired Ferguson. He also maintained that, though the Polyclinic–PNA collective-bargaining agreement had expired, Polyclinic remained obligated to recognize PNA as the presumptive representative of the employees, until it received proof to the contrary. White agreed, and told Kirkpatrick that he would continue negotiating with PNA until there was evidence that PNA did not have the support of a majority of the bargaining unit's members. White also informed Kirkpatrick that a PSEA representative had just approached him, claiming to have bargaining authority from a majority of the nurses, and that if PSEA could establish its claim to majority status, White would recognize PSEA rather than PNA. Kirkpatrick warned White that he would file unfair labor practice charges if Polyclinic unlawfully withdrew recognition from PNA.

Soon thereafter (at around 11:00 a.m.), Kirkpatrick left the bargaining site. "Within moments," White "started right in negotiating" with the *PPNA* negotiating team, which included all of the former members of the PNA team, led by Debra Ferguson. The PPNA bargaining team did not contend at that point either that it was supported by a majority of unit employees, or that it spoke on behalf of PSEA.

White engaged in "concessionary bargaining" with PPNA from before noon until 1:00 a.m. In late afternoon, he was informed of Dr. Hillman's conclusion that a majority of unit employees had signed the PSEA cards. At the end of the session, Polyclinic and

PPNA agreed on a preliminary "contract settlement agreement," which Debra Ferguson signed on behalf of PPNA.

White then turned to the issue of PSEA's representation, acknowledging that the cards had been signed by a majority of unit employees. Accordingly, he wrote out a recognition agreement, effective until June 30, 1995, which stated in part:

[A]s a result of the presentation of the cards and the card check by Dr. Arnold Hillman, [Polyclinic] has objective evidence that PNA is no longer the majority representative of its employees in any appropriate unit and that the union, PSEA, is the majority representative of its employees in the unit formerly represented by PNA.

The agreement further stated that Polyclinic "hereby grants recognition" to PSEA. In return, PSEA "accept[ed] the terms and conditions of employment negotiated between [Polyclinic and PPNA] ... as the terms and conditions of its initial contract with [Polyclinic]." The recognition agreement also included a "maintenance-of-membership" clause, which provided:

All employees who are, or shall become, members of [PSEA] shall remain members over the full duration of this Agreement, except an employee who joined [PSEA] may resign her/his membership therein during the period of fifteen (15) days prior to the expiration of this Agreement.... [A]n employee shall be considered a member of [PSEA] in good standing if the member timely tenders her/his periodic dues. The payment of dues while a member shall be deemed a condition of employment.

Nelson signed the agreement on behalf of PSEA.

PNA (as well as a local AFL–CIO chapter) filed charges with the NLRB. The NLRB General Counsel investigated, and recommended that the charges be pursued. A hearing was then held before an administrative law judge ("ALJ"), who sustained the charges, and the Board affirmed. The ALJ and Board ruled that petitioners had engaged in a variety of unfair labor practices. First, Polyclinic unlawfully refused to bar-

gain with, and withdrew recognition from, PNA at a time that PNA presumptively represented the unit employees. NLRA § 8(a)(5), (1), 29 U.S.C. § 158(a)(5), (1). Second, Polyclinic and PSEA entered into a collective-bargaining agreement at a time that PSEA did not represent a majority of the unit employees. *See id.* § 8(a)(2), (1), 29 U.S.C. § 158(a)(2), (1) (employer); *id.* § 8(b)(1)(A), (2), 29 U.S.C. § 158(b)(1)(A), (2) (union). Finally, that agreement included a clause that coerced employees into remaining members of PSEA, at a time that PSEA was a minority union. *See id.* § 8(a)(3), (2), (1), 29 U.S.C. § 158(a)(3), (2), (1) (employer); § 8(b)(1)(A), (2), 29 U.S.C. § 158(b)(1)(A), (2) (union).

As a remedy, the Board ordered Polyclinic to recognize PNA, rather than PSEA, at least until an election established the nurses' support for an alternative representation arrangement. In addition, it required Polyclinic and PSEA to reimburse the initiation fees and dues of PSEA members who had remained in the union because of the maintenance-of-membership clause in the Polyclinic–PSEA agreement.

## D. *Standard of Review*

■■■ Polyclinic and PSEA petition for review of the Board's ruling, and the Board cross-petitions for enforcement of its remedial order. The NLRB's findings of fact are "conclusive" if supported by substantial evidence on the record viewed as a whole, 29 U.S.C. § 160(e), and not arbitrary or otherwise contrary to established law, *International Union of Electronic, Elec., Salaried, Mach. & Furniture Workers v. NLRB*, 41 F.3d 1532, 1536 (D.C.Cir.1994). Thus, this court may not "displace the Board's choice between two fairly conflicting views even though the court would justifiably have made a different choice had the matter been before it de novo." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951). Given that "the Board draws on a fund of knowledge and expertise all its own," *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 612 n. 32, 89 S.Ct. 1918, 1939 n. 32, 23 L.Ed.2d 547 (1969), "[w]e must also give great deference to the NLRB's selection of remedy," *Caterair Int'l v. NLRB*, 22 F.3d 1114, 1120 (D.C.Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 575, 130 L.Ed.2d 491 (1994). That said, it is also clear that our review may not be so deferential as to act as a rubber stamp for the Board's conclusions, *Gold Coast Restaurant Corp. v. NLRB*, 995 F.2d 257, 263 (D.C.Cir.1993), for our view of the "substantiality of the evidence must take into account whatever in the record fairly detracts from its weight," *Universal Camera Corp.*, 340 U.S. at 488, 71 S.Ct. at 464.

## II. ANALYSIS

### A. *Polyclinic's Withdrawal of Recognition from PNA*

#### 1. *Legal background*

■■■ First we consider the Board's conclusion that Polyclinic violated § 8(a)(5), (1) of the NLRA by summarily withdrawing recognition from, and refusing to bargain with, PNA as the exclusive collective-bargaining representative of the Polyclinic nurses. A union that has been recognized by an employer enjoys a rebuttable presumption of continuing majority support at the expiration of the collective-bargaining agreement. *NLRB v. Creative Food Design Ltd.*, 852 F.2d 1295, 1300 (D.C.Cir.1988). This presumption can, however, be overcome by proof that: (1) the union did not in fact have majority support at the time recognition was withdrawn; or (2) the employer had a good faith, objectively based doubt about the union's majority support. *NLRB v. Curtin Matheson Scientific*, 494 U.S. 775, 778, 110 S.Ct. 1542, 1544, 108 L.Ed.2d 801 (1990).

■■■ Polyclinic contends that it had a good faith basis for doubting PNA's majority status at the point that it ceased negotiating with PNA. On this point, Polyclinic bears the burden of proof. *Allied Indus. Workers, AFL–CIO Local Union No. 289 v. NLRB*, 476 F.2d 868, 881 (D.C.Cir.1973). The good faith doubt must have been based on objective considerations, known at the time Polyclinic refused to bargain with PNA, and not arising from an unfair labor practice aimed at causing employee disaffection with PNA. *Sullivan Indus. v. NLRB*, 957 F.2d 890, 897–98 (D.C.Cir.1992); *Louisiana Dock Co.*, 297

N.L.R.B. 439, 133 L.R.R.M. (BNA) 1178, 1989 WL 224486 (1989).

### 2. *When did the withdrawal occur?*

A threshold issue for us to address is the point in time at which Polyclinic refused to bargain with, and withdrew recognition from, PNA. In their briefs on appeal, both Polyclinic and the Board assumed that the withdrawal occurred when White entered into negotiations with the PPNA representatives. *See* Brief for NLRB at 9 ("Polyclinic withdrew recognition after it cancelled a final bargaining session on July 1 . . . ."); *id.* at 15 ("Polyclinic actually repudiated PNA when it *broke off negotiations* with PNA and reached agreement with the upstart PPNA. . . ." (emphasis added)); Reply Brief for Polyclinic at 4 ("[T]he evidence in this case shows that Polyclinic knew from the *outset of the day* when recognition was withdrawn from PNA that PSEA and not PPNA was the driving force behind the change in bargaining unit affiliation." (emphasis added)). At oral argument, however, Polyclinic appeared to shift ground, and contended that, technically, a refusal to bargain and withdrawal of recognition did not occur until Polyclinic entered into an agreement with PPNA at 1:00 a.m. We believe that Polyclinic had it right in its brief.

 White's own testimony before the ALJ plainly shows that he refused to bargain—in the most literal sense of that term—when he ended his conversation with the PNA official, Michael Kirkpatrick:

Q. Now isn't it true that when Mr. Kirkpatrick showed up he told you that he was prepared to sit down and negotiate with you at that time?

A. I wouldn't deny that. I don't remember him saying it, but I'm sure if he says he said it, he did.

Q. He did in fact tell you that he represented PNA?

A. Oh, sure, yes.

Q. And there was no doubt in your mind that he did represent PNA.

A. Right. I'd never met him, but I knew his name.

Q. And is it true that you made it pretty clear to him that you weren't going to sit down and negotiate with him, but you were going to negotiate with that committee that you'd been negotiating with?

A. That is correct.

Joint Appendix ("App.") at 48–49.

We further conclude that Polyclinic withdrew recognition from PNA at that same point in time. White testified that he began negotiating with PPNA, rather than PNA, because he believed that PNA had lost its majority support. As he put it, "I dealt with the people who in my judgment, in the judgment of our bargaining team, in fact had the representative status of those nurses." App. at 50–51. The label of the particular organization was irrelevant:

I negotiated with the same group of people, no matter what they wanted to call themselves, that I had been dealing with all along. It was not one new face, and they were all old faces in that room.

They chose to call themselves PPNA. They could have called themselves the Boston Red Sox. I was going to deal with those people because I had to get a contract.

App. at 47.

 While Polyclinic did not *formally* withdraw recognition from PNA until the 1:00 a.m. agreement with PPNA, we believe that White's conduct and motivation in negotiating with PPNA constituted a *de facto* withdrawal. A similar situation was presented in *Cargill, Inc. v. Teamsters Local Union No. 769*, 294 N.L.R.B. 867, 1989 WL 224081 (1989), in which an employer declined to bargain with an incumbent union on the basis of a decertification petition signed by a majority of unit employees. The Board concluded that the employer had unlawfully withdrawn recognition:

The totality of the [employer's] conduct persuades us that the . . . refusal to bargain was effectively a withdrawal of recognition. First, both of the . . . refusals were based on the petition. . . . Further, it is apparent . . . that in the Respondent's view, the Union no longer retained its status as the representative of the unit employees.

*Id.* at 867, 1989 WL 224081; *see also Exxel–Atmos, Inc. & United Steelworkers of Am.,* 309 N.L.R.B. 1024, 1024, 1992 WL 390103 (1992) (withdrawal of recognition occurred when employer who believed that election should be held "refus[ed] to meet with the Union's full bargaining committee to engage in any 'formal' negotiations").

### 3. *Was the withdrawal justified?*

#### a. *Authorization cards*

The charges of unlawful withdrawal of recognition and refusal to bargain therefore turn on the essentially factual question of whether Polyclinic had sufficient information to overcome the presumption of PNA's continued majority status when White abruptly began negotiating with PPNA rather than PNA. According to Polyclinic, White acted only after the conversation in the hotel lobby in which Nelson presented White with the PSEA cards that ostensibly showed that PSEA did—and therefore PNA necessarily did not—have majority support. But at the point White began negotiating with PPNA, the only information he had about PSEA's cards was Nelson's *claim* that they were signed by a majority of unit employees; White himself had refused to review the cards, requesting instead that Nelson have them examined by a neutral third party. *Cf. Allied Indus. Workers,* 476 F.2d at 881 ("The naked showing that a decertification petition has been filed, *with no indication of the number of signatories* or other related matters, is an insufficient basis in fact for refusing to bargain. . . ." (emphasis added)). Critically, White began negotiating with PPNA before he received the results of Dr. Hillman's card count. *See NLRB v. Pennco, Inc.,* 684 F.2d 340, 342 (6th Cir.) ("[S]ubsequent events cannot validate an improper withdrawal of recognition."), *cert. denied,* 459 U.S. 994, 103 S.Ct. 355, 74 L.Ed.2d 392 (1982).

#### b. *Defections from PNA*

Polyclinic also contends that it had a good faith, objectively based doubt about PNA's majority status given that the *entire* PNA collective bargaining team had defected from PNA to form PPNA. Polyclinic cites to two Board decisions that draw upon a variety of circumstances in support of a finding that an employer held a sufficient good faith doubt. *Accord Celanese Corp.,* 95 N.L.R.B. 664, 673 (1951) ("By its very nature, the issue of whether an employer has questioned a union's majority in good faith cannot be resolved by resort to any simple formula. It can only be answered in light of the totality of the circumstances involved in a particular case."). But those cases involved *much* stronger indicia of unit employees' disaffection with the incumbent union than is present on these facts. As Polyclinic itself concedes, in *Alexander Muss & Sons,* 274 N.L.R.B. 1330, 1330, 118 L.R.R.M. (BNA) 1629, 1985 WL 45903 (1985), "most of the employees once represented by the union had been on strike for over one year and had been permanently replaced, . . . a majority of the current employees had signed authorizations [*sic*] cards authorizing an outside union to represent them for collective bargaining purposes, and . . . the employees had given no indication of support for the incumbent union." Brief for Polyclinic at 18. Similarly, in *White Castle System,* 224 N.L.R.B. 1089, 1092, 92 L.R.R.M. (BNA) 1591, 1976 WL 7125 (1976), the union had been essentially inactive, union representatives themselves had intimated that the union lacked majority support, and a majority of employees had indicated to the employer that they did not support the union. *Accord International Medication Sys.,* 253 N.L.R.B. 863, 868 n. 23, 106 L.R.R.M. (BNA) 1067, 1980 WL 12654 (1980) (describing *White Castle* as involving "overwhelming" "objective" evidence).

In this case, by contrast, at the time Polyclinic began negotiating with PPNA, it lacked *any* indication of the degree or extent of loss in support for PNA by the 582 unit employees (other than the few, individual members of the bargaining committee), except for the nonspecific knowledge that an unknown number had signed authorization cards calling for a representation election. *See Peoples Gas System v. NLRB,* 629 F.2d 35, 44 (D.C.Cir. 1980) ("Permitting what is essentially a subjective and speculative interpretation of the probable meaning of particular behavior to suffice as 'objective' indicia of lack of majority support would give too little weight to

industrial stability, and would result in repeated disruption of collective bargaining at its most critical point, during the negotiation of new contracts."). White made no effort to discern whether a majority of Polyclinic's 582 nurses agreed with the committee's decision to abandon PNA before he began negotiating with the new, self-appointed PPNA team.

▇ In sum, Polyclinic failed to produce the " 'clear, cogent, and convincing' showing" that this circuit requires of an employer seeking to establish a good faith basis for nonrecognition of an existing representative union. *Williams Enters. v. NLRB*, 956 F.2d 1226, 1234 (D.C.Cir.1992) (quoting *St. Agnes Med. Ctr. v. NLRB*, 871 F.2d 137, 145 (D.C.Cir.1989)). *Accord NLRB v. Koenig Iron Works*, 681 F.2d 130, 137 (2d Cir.1982) (holding that employers "must come forward with easily verifiable and unambiguous evidence supporting their belief that their employees have rejected the incumbent union as bargaining agent"). Certainly, the Board's conclusion that Polyclinic had an insufficient basis for any good faith doubt is supported by substantial evidence on the record viewed as a whole.

## B. *The Polyclinic–PSEA Agreement*

### 1. *Legal background*

Polyclinic and PPNA agreed on a contract at 1:00 a.m. Polyclinic then immediately executed a contract settlement with PSEA that adopted the terms of its just-penned agreement with PPNA. The NLRB concluded that Polyclinic and PSEA thereby violated the NLRA, given that PSEA did not represent a majority of unit employees for collective-bargaining purposes.

▇ In contrast to Polyclinic's argument on the withdrawal charge that it had an objectively based, good faith doubt about *PNA*'s majority status, on these charges involving affirmative recognition of an allegedly minority union, the issue is whether *PSEA* had majority status at the time Polyclinic and PSEA executed their agreement. *International Ladies' Garment Workers' Union v. NLRB*, 366 U.S. 731, 737–38, 81 S.Ct. 1603, 1607, 6 L.Ed.2d 762 (1961). A threshold issue, however, is determining the proper

burden of proof. According to PSEA, under this court's decision in *Teamsters National United Parcel Service Negotiating Committee v. NLRB*, the NLRB General Counsel bears the burden of proving that PSEA was *not* in fact a majority union at the time Polyclinic recognized it. 17 F.3d 1518, 1523 (D.C.Cir.1994) (citing *Rainey Security Agency*, 274 N.L.R.B. 269, 279, 1985 WL 45770 (1985); *American Beef Packers*, 187 N.L.R.B. 996, 997 (1971), *enf'd*, 463 F.2d 818 (D.C.Cir.1972)), *cert. denied*, —— U.S. ——, 115 S.Ct. 722, 130 L.Ed.2d 627 (1995). *Teamsters National*, however, recognized that "[t]he General Counsel's burden should be sensitively calibrated ... to the context in which it must be carried," *id.*, and expressly concluded that certain presumptions could establish a *prima facie* case of "unlawful recognition," *id.* at 1523–24. In fact, the prime example drawn in *Teamsters National* was the presumption that an incumbent union has continued majority support at the termination of a collective-bargaining agreement. *Id.* at 1524. As applied to this case, the presumption that PNA had continued majority support when the Polyclinic–PNA agreement expired establishes the corollary *prima facie* case that PSEA *did not* have majority support at that point in time. Under *Teamsters National*, Polyclinic and PSEA therefore bear the burden of rebutting that *prima facie* case by producing "some reliable evidence of [PSEA's] majority status." *Id.* If they successfully carry that burden, then the unlawful recognition charge may be sustained only if the evidence presented by the General Counsel establishes that PSEA was not supported by a majority of the nurses. *Id.*

### 2. *Authorization cards*

▇ As we noted earlier, a union can attempt to prove that it has the support of a majority of unit employees through "pure" or "dual purpose" cards, or "ambiguous" cards so long as parol evidence establishes that employees were informed that the cards could be used to gain majority status without an election. The PSEA cards at issue in this case are plainly not "pure" cards; they do not state that their purpose is the designa-

tion of PSEA as the signers' bargaining representative. For the same reason, they are not "dual purpose" cards. A "dual purpose" card is simply a "pure" card that in addition expressly states that the employee also supports calling an NLRB-supervised election.

■ What remains is Polyclinic's defense that the cards are "ambiguous," Brief for Polyclinic at 23; Reply Brief for Polyclinic at 6 n. 1, and that this court should accordingly consider parol evidence that the nurses were told that they were authorizing PSEA to seek voluntary recognition as well as an election. The ambiguity that Polyclinic identifies is the bold-type statement at the top of the cards: **"Collective Negotiations Authorization Card."** Polyclinic, however, stretches the term "ambiguous" far beyond its accepted meaning. An "ambiguous" authorization card has the basic characteristics of a "dual purpose" card—*i.e.,* language found in both a "pure" and a "single purpose election" card—but some other factor detracts from the card's clarity. Critically, the PSEA cards do not on their face include any statement—*e.g.,* "I authorize PSEA to represent me for the purpose of collective bargaining" or "I authorize and designate PSEA to represent me in collective bargaining"— clearly calculated to put the signing employee on notice that the card may be used to establish the employee's support for PSEA's recognition absent an election. *Compare NLRB v. Fosdal,* 367 F.2d 784, 786 (7th Cir.1966) (identifying "dual purpose" cards with heading "I WANT AN NLRB ELECTION NOW! AUTHORIZATION FOR REPRESENTATION," but also with affirmative statement that "I authorize the Inter-

national Brotherhood of Electrical Workers, to represent me in collective bargaining with my employer").[4] They are in the final analysis, at least on their face, "single purpose election" cards.

■ That is not to say, however, that even with regard to such cards, the Board would not consider parol evidence of representations made by the union to signing employees that the cards had a "dual purpose." The Board did consider such evidence here, and counsel for the Board took the position at oral argument that such evidence was not irrelevant. That evidence, however, would undoubtedly have to be extremely persuasive to overcome the representations on the cards themselves. *Cf. Gissel Packing,* 395 U.S. at 606, 89 S.Ct. at 1936 ("[E]mployees should be bound by the clear language of what they sign unless that language is deliberately and clearly canceled by a union adherent with words calculated to direct the signer to disregard and forget the language above his signature.").

The evidence presented in this case does not come close to meeting that standard. Nelson testified that his "best guess" is that he personally solicited cards from between 50 and 100 nurses, far fewer than a majority. Moreover, while Nelson testified that he spoke to those individuals "about card signing," there is no evidence of what in particular he told them. Some of the remaining unit employees were solicited by the members of PNA's bargaining committee, whom Nelson says he instructed to tell prospective signers that the cards had a "dual purpose." There is no evidence from committee mem-

---

4. It may be that the bold-type statement at the top of the PSEA cards was designed to comply with the Board's reading of the NLRA to require that even "single purpose election" cards include some indication that the signer authorizes the union to represent her. As the Board explained in the *Nissan Research & Development* case:

> [In] *Levi Strauss & Co.,* 172 NLRB 732, 733 (1968), a case involving a single-purpose authorization card[, we] explained why the language of [NLRA §] 9(c)(1)(A) renders a simple request for a representation election legally insufficient to trigger the Board's processes without some showing that "the employees wish to be *represented* by a *particular labor organization,* a requirement that entails an ex-

> pression of intent in all respects the same as that in an authorization card." Thus, as a practical matter, an ostensibly single-purpose card requesting an election will inevitably be a dual-purpose one, having some reference to the union being the authorized bargaining agent for the signatory employee. *The conundrum is whether the signatory employee is understood to have granted only conditional representational authority for the purpose of holding an election, or instead to have given unreserved authority (which can be used to establish the union's majority status without an election).* 296 N.L.R.B. 598, 600 n. 6, 132 L.R.R.M. (BNA) 1169, 1989 WL 224319 (1989) (third emphasis added).

bers, however, that they in fact followed that instruction. Further, Nelson could not confirm what percentage of the cards had been solicited by the bargaining committee, rather than by other individuals to whom he had never spoken. Given these substantial gaps in Nelson's testimony, the ALJ found Nelson's conclusion that the Polyclinic employees knew they were signing "dual purpose" cards to be "incredible and unsubstantiated." We find that conclusion to be supported by substantial evidence. "[T]he Board is one of those agencies presumably equipped or informed by experience to deal with a specialized field of knowledge, and it would be difficult to imagine a topic more clearly within this specialized field than the evaluation of the significance of the circumstances under which authorization cards are solicited." *International Union, United Auto., Aero. & Ag. Implement Workers of Am. v. NLRB,* 392 F.2d 801, 808 (D.C.Cir.1967), *cert. denied,* 392 U.S. 906, 88 S.Ct. 2058, 20 L.Ed.2d 1364 (1968) (internal quotation marks and citation omitted).

 Even if the PSEA cards, as supplemented by Nelson's testimony, constituted sufficiently "reliable evidence" to overcome the General Counsel's *prima facie* showing of unlawful recognition, petitioners would nonetheless not prevail. The Board could still properly conclude that petitioners' evidence did not overcome the persuasive force of the evidence underlying the General Counsel's *prima facie* case. Accordingly, the Board's conclusion that petitioners violated NLRA § 8(a)(2), (1) and § 8(b)(1)(A), (2) by entering into a collective–bargaining agreement shall be sustained.

## C. The Maintenance–of–Membership Agreement

The final charges against petitioners involve the maintenance-of-membership clause in the Polyclinic–PSEA agreement, which provides that an employee who joined PSEA was required to "remain a member ... for the duration of the collective-bargaining agreement." The NLRB concluded that the clause unlawfully coerced Polyclinic nurses who joined the union, but otherwise would have resigned, into remaining members:

> Inasmuch as the collective-bargaining agreement between the Respondent Employer and the Respondent Union was entered into at a time when it was not established that the Respondent Union represented a majority of the unit employees, the existence of the clause itself, without more, unlawfully discriminates among employees by encouraging membership in the Respondent Union.

 PSEA contends that the Board's finding lacks substantial evidence because the General Counsel failed to identify a single individual who wished to resign from PSEA, but failed to do so because of the maintenance-of-membership clause. Given that PSEA was not the majority representative of the employees, however, we do not believe that the Board was required to identify by name a specific Polyclinic employee who was coerced into remaining a PSEA member.[5] The clause unquestionably discourages PSEA members from resigning while the Polyclinic–PSEA agreement remains in force. It therefore necessarily discriminated by encouraging Polyclinic employees to remain members of a minority union.

5. In its Reply Brief, PSEA suggests that, at the least, the General Counsel should have been required to prove that PSEA had at least one member at Polyclinic. "Not only was there no evidence that any unit employee became a member of PSEA after the execution of the collective bargaining agreement between [sic] Polyclinic but there was, likewise, no evidence that any unit employee joined PSEA *prior* to the execution of the collective bargaining agreement and was thus *forced* to remain a member." PSEA Reply Brief at 3. Admittedly, there is no such evidence in the record. But PSEA was the exclusive collective-bargaining agent for Polyclinic's nurses for an entire year (from July 1, 1993 until the ALJ instituted a remedial order on June 30, 1994). Moreover, in response to the other charges in this case, PSEA takes the contrary position that the 339 unit employees who signed cards intended to designate PSEA to represent them in collective bargaining. In these particular circumstances, had PSEA wished to establish that it had no members, it could easily have put on evidence to that effect in the administrative proceedings. It did not do so, and for a good reason: at oral argument, counsel for PSEA proffered to the court that PSEA does in fact have members at Polyclinic.

*See* 29 U.S.C. § 158(a)(3), (2), (1), *id.* § 158(b)(1)(A), (2); *International Union of Petro. & Indus. Workers v. NLRB,* 980 F.2d 774, 778 (D.C.Cir.1992) ("When an employer and a minority union enter into a contract that contains a union security provision, the employer violates section 8(a)(3) of the Act, and the union violates section 8(b)(2) of the Act."). PSEA is, however, correct that reimbursement is owed only to those employees who retained their membership because of the clause, but identifying which employees voluntarily stayed in the union is an issue to be examined at the compliance stage, not as part of the finding of a violation of the NLRA in the first instance.

### III. CONCLUSION

We conclude that the NLRB's finding that Polyclinic and PSEA engaged in unfair labor practices in violation of the National Labor Relations Act is supported by substantial evidence on the record, and is consistent with established law.

*Petitions denied; order enforced.*